**Affirmed and Substitute Opinion filed July 6, 2023.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-20-00250-CV

---

## CENTERPOINT ENERGY HOUSTON ELECTRIC, LLC, Appellant

## V.

## HOWARD E. COLEMAN AND COLEMAN UPHOLSTERY, INC., Appellees

---

**On Appeal from the 295th District Court
Harris County, Texas
Trial Court Cause No. 2012-19169**

---

### O P I N I O N

We issued our original opinion in this case on March 24, 2022. Both sides filed motions for rehearing. We overrule the motions for rehearing, withdraw our previous opinion, and issue this substitute opinion.

In the aftermath of a fire that destroyed buildings, equipment, and vehicles, Howard E. Coleman and his business Coleman Upholstery, Inc. (collectively, "Coleman") sued CenterPoint Energy Houston Electric, LLC, alleging that

CenterPoint's negligence in relation to maintenance of an electrical transformer on the property caused the fire. After a jury found CenterPoint's negligence proximately caused Coleman's damages, the trial court remitted a portion of the damages and entered a final judgment awarding Coleman $5,835,044.49 plus post-judgment interest. Both sides appealed.

In its first issue, CenterPoint contends that the trial court lacked subject matter jurisdiction because Coleman failed to exhaust his administrative remedies with the Public Utility Commission (PUC) before filing this lawsuit. In its second, third, and fourth issues, CenterPoint challenges the sufficiency of the evidence to support the jury's findings that CenterPoint breached the applicable standard of care and proximately caused Coleman's damages and the amount of damages awarded by the trial court. And in its fifth issue, CenterPoint contends the trial court erred in overruling CenterPoint's objections to certain evidence relating to alleged injury to personal and business credit.

In one cross-appeal issue, Coleman asserts that the trial court erred in remitting a portion of the damages found by the jury. Finding no error in the judgment, we affirm.

### *Background*

In the early morning of October 15, 2010, a fire started on the premises of Coleman Upholstery, an automobile upholstery business owned by Howard Coleman. The fire resulted in significant damage to buildings, equipment, and vehicles on the Coleman property as well as damage to a neighboring property. The apparent origin of the fire—near a utility pole at the edge of the Coleman property—was captured by a security camera on the Coleman premises.

About five weeks before the fire, Coleman experienced a power outage after

the transformer on the utility pole was reportedly emitting sparks and later a loud popping sound. In two visits to the property, CenterPoint technicians performed repairs and restored power.

At the conclusion of their investigation after the fire, Harris County Fire Marshal investigators concluded, based on several indicators, that the fire originated

> within the immediate vicinity of the electrical distribution pole located between the two properties. Video surveillance cameras capture[d] an initiating event within the area of origin at 2:43:21. The initiating event captured on video is an intense, brief illumination characteristic of electrical activity.

> Investigators observed that a large copper ground wire (approximately 1/4" to 3/8" in diameter) running from the transformer on the electrical distribution pole to the ground was unaccounted for. Two small sections of the ground wire were secured to the pole in line with the path that would have traveled from ground to the transformer. Several portions of melted copper were found in the soil at the base of the pole. The soil at the base of the pole was covered with many smaller pieces of copper.

> Copper typically melts at 1981 degrees Fahrenheit. Outdoor fires consuming ordinary combustibles such as wood will not typically reach the temperatures necessary to melt copper. The intensity of damage to the copper ground wire is indicative of an electrical anomaly. It is probable that this fire was the result of the ignition of dry vegetation from a fugitive spark or ember that result[ed] from an unspecified electrical anomaly from the electrical distribution system.

In 2012, Coleman and the owners of the neighboring property sued CenterPoint for damages resulting from the fire, alleging that CenterPoint's negligence in relation to maintaining the transformer and related equipment caused the fire. The plaintiffs designated Michael McGraw as their expert regarding the transformer and the cause of the fire. CenterPoint filed a motion to exclude

3

McGraw's testimony, asserting that he was not qualified to opine regarding the cause of the fire, the workings of the transformer, or the standards of care applicable to a utility. The trial court granted the motion to exclude McGraw's testimony and a subsequent no-evidence motion for summary judgment, the plaintiffs appealed, and we reversed and remanded in a prior opinion, holding McGraw was qualified to testify. *Cura-Cruz v. CenterPoint Energy Houston Electric, LLC*, 522 S.W.3d 565 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

On remand, the owners of the neighboring property settled with CenterPoint and trial proceeded only on Coleman's claims. The jury heard testimony from Coleman, his wife, and some of his employees regarding the operation of Coleman Upholstery and the impact of the fire on the business; the CenterPoint technicians regarding the work they performed on the transformer; Coleman's technical expert McGraw and financial expert James Claywell; and CenterPoint's technical expert Jeff Hautanen and financial expert Jeffrey Compton. Other evidence the jury received included the fire marshal reports, the video showing the start of the fire, numerous photographs taken of the transformer and the scene of the fire, and Coleman's financial statements and tax returns. Because the testimony of each side's technical expert is key to multiple issues in this appeal, we will describe it in some detail here. Other testimony and evidence will be presented as needed in the analysis section of the opinion.

McGraw, Coleman's technical expert, began his testimony by detailing his qualifications and his investigation into the cause of the fire. McGraw has been involved in circuit design and manufacturing of medium voltage electrical equipment since 1978, including testing and failure analysis. He concurred with the fire marshal's office that the fire was likely caused by an electrical anomaly from

4

the electrical distribution system when a ground fault led to an arc flash or plasma discharge. McGraw opined that the failure of three safety components contributed to the cause of the fire: (1) the high-voltage (HV) bushing, an insulated ceramic device attached at the top of the transformer that functions as the entry point for the high voltage from the electrical power grid into the transformer and from or near which the arc flash originated; (2) the external fuse, which should have cleared or blown, thus stopping the flow of energy, but failed to do so for an extended period of time; and (3) the copper ground wire that ran from the transformer down the pole and into the ground and was intended to provide a path for fault current to go into the ground.

Based on physical evidence he observed at the scene and his interpretation of the video, McGraw opined that prior to the fire starting, the HV bushing on the transformer became compromised, permitting an arc flash or uncontained voltage in or near the HV bushing that first went to the transformer tank and then flashed over to the equipment ground when the bushing ruptured. When the voltage proceeded down the ground wire, which McGraw referred to as a "very small conductor," the wire was ripped apart, melted, and vaporized. The arc flash then contacted dry vegetation at the base of the pole, starting the fire. Molten copper from the ground wire hitting the vegetation may have also contributed to start the fire. A couple gallons of the insulating mineral oil inside the transformer was expelled when the HV bushing ruptured and its seal on the transformer broke. The highly flammable oil likely added fuel to the fire at the base of the utility pole. During the fire, the external fuse eventually cleared, stopping the voltage and cutting off power to the security camera. After the fire, the HV bushing was found to have broken, and the inside of the bushing had black marks that McGraw identified as carbon from the arc flash. He also observed signs of the arc flash

5

inside the transformer tank, including more black markings and bubbling of the tank coating.

McGraw opined that the exercise of ordinary and reasonable care commensurate with the danger involved dictated that each of these three safety components be installed in a proper and dielectrically consistent manner and maintained in good working condition to prevent an event like the one in question from occurring.[1] He explained that it is necessary to regularly inspect, maintain, and repair or replace these three safety components to keep them in good working condition and, in reasonable scientific and engineering certainty, if the three safety components are maintained in good working condition through proper installation, inspection, maintenance, repair, and replacement, it is more likely than not that they will not fail and instead will work properly and thereby prevent an event like the one in question from occurring. And this can be accomplished at a reasonable cost consistent with good business practices, reliability, safety, and expedition.

McGraw specifically faulted CenterPoint because its technicians, who responded to the power outage five weeks before the fire, only performed, in the words of one of the technicians, a "cursory visual inspection" of the transformer components and did not conduct diagnostic testing to determine the cause of the earlier problems. He said that the reported overheating of the bus work and blowing of the fuse would have caused him concern. He specifically suggested CenterPoint had a responsibility under the circumstances to conduct either a "Megger test" or a "high potential test" of the transformer and specifically the HV bushing to make sure there was no leakage current or compromise to ground. According to McGraw, although a high potential test can be time-consuming

---

[1] "Dielectric" as an adjective means "[h]aving the property of transmitting electric force without conduction; insulating." Concise Oxford English Dictionary 399 (12th ed. 2011).

6

because it requires removing the transformer, a Megger test is not time-consuming and neither test is expensive to conduct. He further asserted that many of his client utilities keep handheld Megger devices on their trucks but CenterPoint does not routinely provide them to their technicians. A Megger device is used to inject voltage into the equipment being tested and then measure to make sure that no partial discharges or leakage currents are occurring. He explained that with an oil-filled transformer, such as the one at issue here, a cursory visual inspection will not reveal the conditions inside the tank and "the only way you can determine if something is wrong is to test."

Referring to recurring issues with the same transformer, McGraw said that

if you get that many service calls on one piece of equipment in a very short period of time, months, it's a pretty good indication that that's a trouble area and you need to investigate and test more to find out why you keep having to go back. [I]f it had been my transformer and I kept having problems with the same transformer and the same service drop over and over again, I'd be all over it, trying to figure out what it is that's really causing all these issues, because ultimately at 19 [kilovolts], if you have a whoops, it's catastrophic.

McGraw concluded that CenterPoint failed to exercise reasonable judgment under the circumstances and breached the standard of care. He said that when put on notice that the transformer had experienced a ground fault, CenterPoint had a duty to determine the cause rather than just replacing a few components and putting the transformer back into service.

Regarding the failure of the ground system to contain the voltage, McGraw indicated the system was too small and too weak for the voltage involved. He explained that the ground wire came down the utility pole from the transformer, into the ground, and then went underneath the pole. He said that it needed to be designed and engineered properly in the beginning, which requires installation in a

7

dielectrically consistent manner for the applied voltages. He suggested had the ground grid been "stronger, larger," the wire would likely not have melted. McGraw did not offer specific criticisms regarding the external fuse other than the fact that it failed to clear in response to the arc flash and had recently been replaced by CenterPoint.

On cross-examination, McGraw acknowledged that he could not state the exact reason why the security camera continued to operate after the fire began. He further agreed that he had no specific criticism of the work that the technicians actually performed under the circumstances and could not say that anything they did caused the fire or was negligent. He admitted he did not know of any specific utility that had a transformer maintenance program that required high potential or Megger testing on a regular basis.

CenterPoint's technical expert, Jeffrey Hautanen, also began his testimony by describing his qualifications and investigation. Hautanen admitted he did not know what caused the fire but insisted it was not ignited by an electrical anomaly from the power system, as determined by McGraw and the fire marshal investigators. Hautanen noted the presence of metal barrels on the property with indications that something had been burned inside of them prior to the fire. He also noted that at least one of the power cords that stretched across the property exhibited signs of having experienced "arcing effects." And he noted a battery on the property that could have been an ignition source and suggested an employee could have been smoking in the area.

Hautanen went through the video of the fire for the jury and concluded that the fire did not start at the base of the utility pole but some distance away from the pole. He also explained that if there had been an electrical system anomaly, one would expect to see "flutters, fluctuations" on the video and a camera connected to

the system would typically "drop out." He opined instead that the video recording finally shut off when the fire got into the trees and thereby impacted the main electricity transmission line.

Hautanen further questioned several of McGraw's conclusions. He disagreed with McGraw's hypothesis that the copper ground wire was ripped apart, melted, and vaporized by electrical arcing and instead asserted the fire, infused by wind, had gotten hot enough to melt the copper. Hautanen also rejected the idea that a flashover had occurred within the transformer tank, stating that there would have been a loss of metal from the tank itself if that had occurred. He maintained that the fracturing of the HV bushing and loss of oil from the transformer tank were the result of high temperatures from the fire and were not related to the cause of the fire. Hautanen asserted that he tested the transformer after the fire and does not believe that it failed. He concluded that nothing about the condition of the transformer components indicated a corona or flashover had developed. He said that he has never seen fuses on a transformer fail to clear timely; he acknowledged that there are conditions under which a fuse disconnect can "hang" after a fuse element blows but asserted that did not occur in this instance.

Hautanen further discounted the fire marshal investigators' conclusions by explaining that they look for signs of arson and are not looking to assign cause or fault for private sector purposes. Accordingly, he said, their investigation is often preliminary and lacks follow-through testing and analysis. He particularly thought that their decision to eliminate the power cords on the property as an ignition source, because none of the breakers to which they were assigned had tripped, was a poor decision.

On cross-examination, Hautanen stated that he has spent his career as a forensic engineer, spending 80-90 percent of his time on claims and lawsuits. As of

the date of this trial, he had testified in depositions or trials 87 or more times and had worked in this capacity on behalf of CenterPoint for approximately twenty years. Hautanen explained that he did not make a determination on the cause of the fire because some evidence had not been retained, but he acknowledged he was given unfettered access to the site after the fire. He said that he has never seen a transformer maintenance program in the United States; instead, utilities rely on outages and smart meters to know when to service transformers.

The jury charge was comprised of only two questions. Question 1 asked, "Did the negligence, if any, of CenterPoint . . . proximately cause the occurrence in question?" Negligence was defined in the charge as the "failure to use ordinary care, that is, failing to do that which a public utility of ordinary prudence would have done under the same or similar circumstances or doing that which a public utility of ordinary prudence would not have done under the same or similar circumstances." Question 2 was contingent on Question 1 and asked the jury what sum would compensate Coleman for certain types of possible damages. The jury answered "yes" to Question 1 and found damages in response to Question 2 in the amounts of $3,633,917 for past lost profits, $803,957 for past property damage, $450,000 for past damage to personal and business credit, and $50,000 for future damage to personal and business credit.

Among other post-judgment filings, CenterPoint moved for a remittitur of lost profits damages. The trial court then suggested a remittitur, which Coleman accepted while preserving the right to appeal. The remittitur reduced the amount of lost profits damages awarded from $3,633,917 to $2,763,435. In an amended final judgment, the trial court awarded Coleman a total of $5,835,044.49 in damages and prejudgment interest plus post-judgment interest. Both sides appealed.

## I. CenterPoint's Appeal

As stated above, CenterPoint challenges the trial court's jurisdiction as well as the sufficiency of the evidence to support liability and damages and the trial court's overruling of certain evidentiary objections. We begin our discussion with the jurisdictional challenge.

## A. Jurisdiction

In its first issue, CenterPoint contends that the trial court lacked subject matter jurisdiction over this dispute because the PUC has exclusive original jurisdiction over issues underlying Coleman's claims and Coleman failed to exhaust administrative remedies with the PUC before filing the lawsuit. Subject-matter jurisdiction is essential to a court's power to decide a case and can be raised at any time. *See City of Houston v. Rhule*, 417 S.W.3d 440, 442 (Tex. 2013); *Alfonso v. Skadden*, 251 S.W.3d 52, 55 (Tex. 2008).[2] Whether a trial court has subject matter jurisdiction is a question of law, to which we apply a de novo standard of review. *Minton v. Gunn*, 355 S.W.3d 634, 639 (Tex. 2011).

### 1. Governing Law

A line of recent Texas Supreme Court opinions has explored the question of when common law claims such as torts or breaches of contract fall within the scope of the PUC's exclusive original jurisdiction. *See In re Oncor Elec. Delivery Co.*, 630 S.W.3d 40 (Tex. 2021) (holding personal injury action against utility alleging negligence and consumer-protection violations stemming from customer's sustaining electric shock injuries while trimming tree limbs near a power line did

---

[2] Coleman argues that CenterPoint's jurisdictional argument is barred by the doctrine of estoppel by laches. Subject matter jurisdiction, i.e., a court's power to hear a case, cannot be created by estoppel. *See, e.g., Wilmer-Hutchins I.S.D. v. Sullivan*, 51 S.W.3d 293, 294 (Tex. 2001) (per curiam); *San Jacinto River Auth. v. Paxton*, No. 03-18-00547-CV, 2019 WL 3952829, at *4 (Tex. App.—Austin Aug. 22, 2019, no pet.) (mem. op.). And, as indicated above, a question regarding a court's jurisdiction can be raised at any time. *See Alfonso*, 251 S.W.3d at 55. Coleman does not cite any authority carving out an exception for estoppel by laches.

not have to begin in the PUC); *In re CenterPoint Energy Houston Electric, LLC*, 629 S.W.3d 149 (Tex. 2021) (plurality op.) (holding wrongful-death action against utility stemming from contact with downed power line and alleging negligence in the selection of fuse size for the line did not have to begin in the PUC)[3]; *In re Tex.-N.M. Power Co.*, 625 S.W.3d 42 (Tex. 2021) (holding property damage claims resulting from wooden utility construction mats carried by floodwaters did not have to begin in PUC); *Oncor Elec. Delivery Co. LLC v. Chaparral Energy, LLC*, 546 S.W.3d 133 (Tex. 2018) (holding breach of contract action had to begin in the PUC when plaintiff complained of a failure to timely provide electrical service and resolution of claims required interpretation of utility's PUC-approved tariff).

Within these opinions, the court has grappled with the contrasting purposes of the State's regulation of public utilities, which "acts as a counterweight to public utility monopolies, ensuring that they charge fair rates and adequately provide vital services," and the tort system, the "fundamental purposes" of which "are to deter wrongful conduct, shift losses to responsible parties, and fairly compensate deserving victims." *In re Oncor*, 630 S.W.3d at 43 (respectively citing Tex. Util Code § 31.001 and quoting *Roberts v. Williamson*, 111 S.W.3d 113, 118 (Tex. 2003)). "Regulation," the court has further explained, "is the government's prospective ordering of marketplace conduct," while "tort lawsuits are retroactive case-by-case correctives." *Id*. There are, however, circumstances under which tort and other common law actions must begin in the PUC.

---

[3] In *In re CenterPoint*, the plurality opinion was joined by four justices. 629 S.W.3d at 152. A concurring justice agreed that under established precedent, the disposition was correct ("the plaintiffs here are not the 'kind of "affected person" who may bring a claim to the Commission' and have not brought 'the kind of claim that the Commission can adjudicate'") but declined to join the plurality opinion. *Id*. at 166 (Boyd, J., concurring). Two justices dissented, and one justice did not participate in the decision. Plurality opinions of the Texas Supreme Court do not constitute binding precedent but may be cited as persuasive authority. *See Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 626 (Tex. 1996); *D.M. Diamond Corp. v. Dunbar Armored, Inc.*, 124 S.W.3d 655, 659 n.6 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

As instructed by the supreme court, our analysis of this issue begins with the presumption that district courts are constitutionally empowered to resolve legal disputes. *See Chaparral Energy*, 546 S.W.3d at 138; *see generally* Tex. Const. art. V, § 8. To overcome that presumption, the constitution or a statute must grant exclusive jurisdiction to another court or an administrative agency. *See Chaparral Energy*, 546 S.W.3d at 138. Administrative agencies do not enjoy the jurisdictional presumption of district courts but are legislative creations with only such powers as are expressly conferred and necessary to accomplish their duties. *See id*. A state agency has exclusive original jurisdiction when the legislature has granted the agency sole authority to make an initial determination in a dispute. *Id*. When an agency has exclusive jurisdiction, courts lack jurisdiction until the party has exhausted all available administrative remedies before the agency. *Id*. Whether an agency has exclusive jurisdiction is a question of statutory interpretation that we review de novo. *Id*. It is the burden of the party resisting the district court's jurisdiction to demonstrate that an agency has exclusive original jurisdiction. *In re Oncor*, 630 S.W.3d at 44–45; *In re CenterPoint*, 629 S.W.3d at 156.

The legislature may grant an agency exclusive original jurisdiction via either of two methods. A statute expressly grants an agency exclusive jurisdiction when its language clearly expresses an intent for the agency to have exclusive jurisdiction over matters governed by the statute. *Chaparral Energy*, 546 S.W.3d at 138. In the absence of an explicit grant, an agency may still have exclusive jurisdiction when a "pervasive regulatory scheme" indicates the legislature intended for the regulatory process to be the exclusive means of remedying the problem to which the regulation is addressed. *Id*.

CenterPoint is a public electric utility regulated by the PUC.[4] The Texas

---

[4] The PUC's authority is to some degree limited based on geographical location. It is

Public Utility Regulatory Act (PURA) grants the PUC broad powers to "regulate and supervise the business of each public utility within its jurisdiction and to do anything specifically designated or implied by [PURA] that is necessary and convenient to the exercise of that power and jurisdiction." Tex. Util. Code § 14.001. In regard to electric utilities, the purpose of PURA "is to establish a comprehensive and adequate regulatory system . . . to assure rates, operations, and services that are just and reasonable to the consumers and to the electric utilities." *Id*. at 31.001(a). The PUC's jurisdiction is limited in part by the legislature's stated objective in enacting PURA, that it was "for the purpose of regulating rates and services so that such rates may be fair, just, and reasonable, and the services adequate and efficient." *In re Oncor*, 630 S.W.3d at 46 (quoting Public Utility Regulatory Act, 64th Leg., R.S., ch. 721, sec. 17(a), 1975 Tex. Gen. Laws 2327, 2334–35 (codified at Tex. Rev. Civ. Stat. art. 1446c, § 17)). That the PUC was created as a regulatory body also provides a limitation on its authority to adjudicate disputes; essentially, it cannot adjudicate what it does not regulate. *See id*. at 46-47. Within that limitation, PURA grants the PUC exclusive original jurisdiction both expressly and by the creation of a "pervasive regulatory scheme." *See In re CenterPoint*, 629 S.W.3d at 156; *Chaparral Energy*, 546 S.W.3d at 139. The question then is whether Coleman's claims fall within the scope of the exclusive original jurisdiction provided in PURA such that they must start their path toward resolution at the PUC.[5] CenterPoint argues that the PUC has exclusive original jurisdiction in this case both because Coleman is an "affected person" expressly

---

undisputed in this case that the property in question was within the PUC's area of primary authority. *See generally* Tex. Util. Code §§ 32.001, 33.001(a).

[5] When issues underlying a claim fall within the PUC's jurisdictional scope but the complaining party seeks a remedy that the PUC cannot provide, such as damages, resolution may require a two-step process, where the PUC first resolves questions within its purview and then a court determines the remaining issues necessary for resolution of the claim. *See Chaparral Energy*, 546 S.W.3d at 141-42.

eligible to file a complaint under PURA and because Coleman's claims involve underlying issues that fall within PURA's pervasive regulatory scheme. We will address each assertion in turn.

### 2. "Affected Person"

Pursuant to Utilities Code section 15.051, "[a]n affected person may complain to the regulatory authority in writing setting forth an act or omission by a public utility in violation or claimed violation of a law that the regulatory authority has jurisdiction to administer or of an order, ordinance, or rule of the regulatory authority." Tex. Util. Code § 15.051. As relevant here, the Code defines "affected persons" as persons "whose utility service or rates are affected by a proceeding before a regulatory authority." *Id*. § 11.003(1)(B).

CenterPoint first emphasizes that Coleman was a CenterPoint customer at the time of the fire and Coleman's claims allege negligence in regard to equipment that provided electrical services to Coleman's property. CenterPoint insists that Coleman was an "affected person" under PURA because he was a customer "whose utility service [would be] affected" by a proceeding before the PUC. *Id*. CenterPoint further asserts that any determination regarding whether it was negligent in its maintenance of the transformer and other equipment "would directly impact the manner in which CenterPoint provides electrical service to Appellees and its other customers."

Although Coleman was undoubtedly a customer at the time of the fire, his claims do not complain about his rates or his service. As described in detail above, Coleman alleges that CenterPoint's negligence in regard to the transformer and related equipment caused a fire on his property. Coleman does not complain about rates charged, a failure to provide timely service, the adequacy of his service, or an interruption to his service. In *In re Oncor*, the supreme court concluded that an

electric utility may not compel a plaintiff who alleges a common law personal injury claim to initiate the claim in the PUC unless the claim complained about rates or the provision of electrical service (i.e., "lights on or off" as the supreme court phrased it). 630 S.W.3d at 43; *see also In re CenterPoint*, 629 S.W.3d at 157 (explaining that plaintiffs in that case were not "affected persons" under PURA because "none of the issues underlying their claims complain of a statutory or regulatory violation affecting their utility service or rates."). The same reasoning can be applied in this case where Coleman does not complain about rates or services. CenterPoint's argument that Coleman was an affected person because the manner in which it provides services to all of its customers could be impacted by a determination in this case shoots too broadly. If that were the standard, it is difficult to imagine a lawsuit in which a utility could not claim that a determination in the case would impact how it operated in the future. That is not the standard.

The court in *In re Oncor* further noted that the personal injury claim in that case could just as easily have been brought by a noncustomer and arose in part from Oncor's duty to maintain premises that it occupied, i.e., its utility easement across the plaintiff's property. 630 S.W.3d at 49 ("While the provision of electricity service (and its timeliness) falls squarely in the regulatory sphere, a duty alleged against an occupier of the premises does not."). Here, Coleman essentially alleged his damages resulted from CenterPoint's failure to properly maintain its equipment, which was on a utility easement on Coleman's property. Although Coleman received services from CenterPoint, his complaint is not about the services but about CenterPoint's alleged failure to properly install, inspect, maintain, repair, and replace its equipment to avoid starting a fire. More specifically, Coleman alleged CenterPoint's negligence resulted in the equipment failing to contain the voltage coming into the transformer, which resulted in the

16

ignition of dry vegetation at the base of the utility pole on Coleman's property. CenterPoint offers no argument as to why Coleman could not have made the same claim had he not been a CenterPoint customer, for example, if his property had been undeveloped and not receiving electrical services or, as occurred for the other original plaintiffs in this very lawsuit, he had owned a neighboring property to the one with the utility pole and easement. The mere fact that Coleman's claims may be tangentially related to the fact that he was receiving electrical services from CenterPoint does not render him an affected person under PURA. *See id*. at 43.

### 3. Pervasive Regulatory Scheme

Additionally, the PUC does not possess exclusive original jurisdiction over Coleman's claims under PURA's pervasive regulatory scheme because Coleman's allegations do not concern issues that the PUC actually regulates. *See id*. at 47 (explaining that PUC adjudicatory jurisdiction is limited to issues that implicate regulatory matters), 51 (explaining that the legislature has not commanded that agency jurisdiction turns solely on whether the injured party "happens to be a utility customer or other 'affected person'"); *In re CenterPoint*, 629 S.W.3d at 161-64 (holding that although PUC had exclusive jurisdiction to *regulate* issues underlying plaintiff's claims, because it had not done so and no other law that it was empowered to adjudicate did so, it did not have jurisdiction to *adjudicate* those issues).

At the outset, we note that CenterPoint has misconstrued Coleman's allegations. CenterPoint describes Coleman's allegations as asserting CenterPoint negligently failed to (1) adopt a formal, proactive maintenance program for its transformers and (2) provide all of its service technicians with Megger devices and mandate the regular use of such devices in maintaining its transformers. CenterPoint, however, does not cite to where Coleman alleged either of these

things, much less limited himself to these theories.

As set forth in detail above, McGraw, Coleman's technical expert, generally asserted that CenterPoint's failure to properly install, inspect, maintain, repair, and replace its equipment proximately caused the fire. More specifically, he faulted CenterPoint for only visually inspecting the transformer and related equipment after having repeated problems and not conducting diagnostic testing. He opined that given the history of problems, CenterPoint had a responsibility to conduct either a "Megger test" or a "high potential test" of the transformer and HV bushing to make sure there was no leakage current or compromise to ground rather than just replacing a few components and putting the transformer back into service. According to McGraw, "if you get that many service calls on one piece of equipment in a very short period of time, months, it's a pretty good indication that that's a trouble area and you need to investigate and test more to find out why you keep having to go back." McGraw additionally criticized the size and strength of the ground grid attached to the transformer, explaining that it required installation in a dielectrically consistent manner for the applied voltages.

Although McGraw mentioned that many of his client utilities keep handheld Megger devices on their trucks, he did not specifically fault CenterPoint for failing to provide all of its technicians with Megger devices and mandate the regular use of such devices in maintaining its transformers, as CenterPoint suggests. Instead, McGraw merely said that they should have performed diagnostic testing under the circumstances presented in this case. Likewise, while McGraw suggested that a formal service program for transformers would be "valuable to their system," he did not testify that CenterPoint breached the standard of care in this case by failing to have a formal, proactive maintenance program for all of it transformers. Again, instead, he faulted CenterPoint for not performing diagnostic testing on this one

transformer and related equipment under the circumstances presented and for not properly installing, inspecting, maintaining, repairing, and replacing its equipment.

That said, we turn to the question of whether the issues underlying these claims fall within the scope of the PUC's adjudicatory jurisdiction. As discussed, at the heart of the allegations is whether CenterPoint properly installed, inspected, maintained, repaired, and replaced its equipment and whether it had a duty to perform diagnostic testing on the transformer and related equipment given its alleged recent history of problems or whether simply replacing some components and placing the transformer back in service met the applicable standard of care. As described below, we conclude that none of the PUC regulations cited by CenterPoint displace the common-law standard of care with respect to these issues and whether that standard has been met in individual cases is not a question of rules or regulations within the PUC's purview. *See In re CenterPoint*, 629 S.W.3d at 162. Accordingly, PURA's pervasive regulatory scheme does not give the PUC exclusive original jurisdiction because the parties' dispute does not involve PUC regulatory action. *See id*. at 163.

CenterPoint cites three provisions of the Texas Administrative Code, Title 16, in support of its position that the PUC regulates these issues. 16 Tex. Admin. Code §§ 25.52(b)(1), (4), 25.101(d). The portions of these provisions on which CenterPoint relies read as follows:

- Section 25.52(b)(1): "Every utility shall make all reasonable efforts to prevent interruptions of service."

- Section 25.52(b)(4): "Each utility must maintain adequately trained and experienced personnel throughout its service area so that the utility is able to fully and adequately comply with the service quality and reliability standards."

19

- Section 25.101(d): "Each electric utility shall construct, install, operate and maintain its plant, structures, equipment, and lines in accordance with [provisions of the American National Standards Institute, Inc., the National Electrical Safety Code, and such other codes and standards that are generally accepted by the industry]."

CenterPoint contends that these provisions sufficiently regulate the maintenance of electrical equipment by a utility such that the PUC has exclusive jurisdiction to determine whether it met the applicable standards. CenterPoint made a similar argument in *In re CenterPoint*, which involved a question of whether CenterPoint had employed a properly-sized fuse on electrical lines. 629 S.W.3d at 162. Indeed, in that case, CenterPoint cited both sections 25.52(b)(1) and 25.101(d). A plurality of the supreme court, however, expressly rejected these provisions as being too general to supply a standard of care in a negligence case, stating "regulations generally requiring a party to act safely or reasonably do not substitute a legislatively imposed standard of conduct for the reasonable person standard of common-law negligence." *Id*. at 163 (citing, *e.g.*, *Entex, a Div. of Noram Energy Corp. v. Gonzalez*, 94 S.W.3d 1, 8–9 (Tex. App.—Houston [14th Dist.] 2002, pet. denied)).[6] Although the *In re CenterPoint* court did not address section 25.52(b)(4), regarding maintaining a trained and experienced staff, that provision likewise appears too general to provide a standard. CenterPoint does not cite any other law or regulations as proof that the PUC specifically regulates the installation, inspection, maintenance, repair, or replacement of transformers and associated equipment. If the PUC does not regulate the issues underlying Coleman's claims pursuant to PURA's pervasive regulatory scheme, it does not

---

[6] A fifth justice, concurring in the disposition, also agreed that the plaintiff in *In re CenterPoint* had not brought "the kind of claim that the Commission can adjudicate." 629 S.W.3d at 166 (Boyd, J., concurring); *see also supra* n.4.

20

have exclusive original jurisdiction to adjudicate Coleman's claims. *See id*. at 161-64.[7]

### 4. Conclusion

The PUC does not have exclusive original jurisdiction over the underlying issues in this case by express grant or under PURA's pervasive regulatory system. Accordingly, Coleman was not required to exhaust any administrative remedies and the trial court possessed subject matter jurisdiction over Coleman's claims. We overrule CenterPoint's first issue.

## B. Sufficiency of the Evidence

A negligence claim requires proof of circumstances giving rise to a legal duty owed by the defendant to the plaintiff, a breach of that duty, and damages proximately caused by that breach. *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 782 (Tex. 2001); *Davis-Lynch, Inc. v. Asgard Techs., LLC*, 472 S.W.3d 50, 63 (Tex. App.—Houston [14th Dist.] 2015, no pet.). In its second, third, and fourth issues, CenterPoint challenges the sufficiency of the evidence to support the jury's findings that CenterPoint breached the applicable standard of care and proximately caused Coleman's damages and the amount of damages awarded by the trial court.

When examining a legal-sufficiency challenge, we review the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822

---

[7] It is not entirely clear whether CenterPoint intended to argue that the PUC has exclusive original jurisdiction because resolution of the underlying issues allegedly require interpretation of CenterPoint's PUC-approved tariff. To the extent that CenterPoint intended to do so, we note that in the prior appeal, we held that the "Good Utilities Practice" required in the tariff did not impose a new or additional standard that was different than the common law duty of care. *See Cura-Cruz*, 522 S.W.3d at 571-72; *see also In re CenterPoint*, 629 S.W.3d at 165 ("We see no indication that the Legislature intended the PUC to resolve issues based on a tariff where no tariff provisions alter the applicable legal standards.").

(Tex. 2005). We credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id*. at 827. When a party attacks the legal sufficiency of an adverse finding on which it did not have the burden of proof, the party must demonstrate on appeal that no evidence supports the finding. *Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014) (per curiam).

In a factual-sufficiency challenge, we consider and weigh all the evidence, both supporting and contradicting the finding. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998). We will set aside a finding for factual insufficiency only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id*. at 407. The amount of evidence required to affirm is far less than the amount necessary to reverse a judgment. *Harris Cty. v. Coats*, 607 S.W.3d 359, 381 (Tex. App.—Houston [14th Dist.] 2020, no pet.).

As trier of fact, the jury is the sole judge of witness credibility and may accept or reject all or part of the testimony provided by any witness. *See, e.g., Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). This generally includes testimony provided by experts. *See Gator Gone Safety Pilots v. Holt*, 622 S.W.3d 524, 537 (Tex. App.—Houston [14th Dist.] 2021, no pet.).

**1. Breach of Duty**

CenterPoint first challenges the legal and factual sufficiency of the evidence to support the jury's finding that CenterPoint breached a duty of care owed to Coleman. CenterPoint generally does not differentiate between its legal and factual sufficiency arguments. We will begin our analysis by offering a synopsis of Coleman's theory of breach, based primarily on expert McGraw's testimony. We will then address each of CenterPoint's specific critiques.

As discussed in detail above, McGraw testified that the fire was most likely caused when an arc flash that originated in or near a compromised HV bushing destroyed the copper ground wire and then ignited dry vegetation near the base of the utility pole. Molten copper from the wire and oil expelled from the transformer through the broken seal of the bushing also likely contributed to the fire. McGraw opined that three safety components failed, causing or contributing to the cause of the fire: the HV bushing, an external fuse, and the ground wire. According to McGraw, had there not been a dielectric and insulation breakdown of the HV bushing, had the external fuse not failed to clear, or had the ground system been adequate, the fire never would have started. Moreover, he said that had the components been properly installed, inspected, maintained, repaired, and replaced, they would not have failed and, given the level of danger involved, CenterPoint had a duty of care to properly install, inspect, maintain, repair, and replace those safety components. McGraw further asserted that CenterPoint had ample warning of a problem and opportunity to fix any issues but failed to do so, thus breaching the duty of care.

In support of his conclusions, McGraw cited CenterPoint records and the deposition testimony of CenterPoint's technicians. He also cited the video, which recorded the start of the fire, photographs of the equipment and the burn patterns on the property taken after the fire, and certain physical evidence including the appearance of the HV bushing, copper wire, and transformer tank after the event. The HV bushing was broken and had black marks on it from carbon as a result of an arc flash. The copper wire was ripped-apart, melted, and vaporized. The transformer tank had burn marks and a bubbling pattern on the inside, indicating an arc flash had occurred.

McGraw opined that in reasonable scientific and engineering certainty, if the

23

three safety components are maintained in good working condition through proper installation, inspection, maintenance, repair, and replacement, it is more likely than not that they will not fail, and instead will work properly and prevent an event like the one in question from occurring. He specifically faulted CenterPoint because its technicians only visually inspected the transformer, HV bushing, and related equipment and did not conduct a Megger test or other diagnostic test to determine the cause of earlier equipment troubles. He indicated CenterPoint had a responsibility under the circumstances to conduct such testing to make sure there was no leakage current or compromise to ground and not simply replace a couple of components and restore power. He said that

> if you get that many service calls on one piece of equipment in a very short period of time . . . it's a pretty good indication that that's a trouble area and you need to investigate and test more to find out why you keep having to go back . . . because ultimately at 19 [kilovolts], if you have a whoops, it's catastrophic.

McGraw also questioned the adequacy of the ground system, the failure of which he said likely caused or contributed to causing the fire. He insisted the system should have been installed in a dielectrically consistent manner for the applied voltages and had it been "stronger, larger," it likely would not have failed to contain the voltage in this case. McGraw concluded that CenterPoint's failure to maintain its equipment in good working condition through proper installation, inspection, maintenance, repair, and replacement was a proximate cause of the fire.

The fire marshal investigators concurred that the fire probably started when an unspecified electrical anomaly from the electrical distribution system ignited dry vegetation at the base of the utility pole. Although CenterPoint's expert, Hautanen, criticized both McGraw and the fire marshal's conclusions, he did not offer a strong alternative hypothesis for how the fire started, suggesting

24

possibilities like burn barrels and extension cords that were rejected by McGraw and the investigators. Hautanen also disagreed with McGraw and the investigators' interpretation of the video of the fire.

CenterPoint begins its challenge to the evidence of breach by asserting that Coleman was required and failed to present evidence of three predicates: "(1) the transformer caused the fire, (2) the transformer's components were defective, and (3) CenterPoint negligently maintained the transformer." We will interpret CenterPoint's argument as including equipment related to the transformer as discussed by McGraw in his testimony.

**Did the transformer cause the fire?** Regarding the first alleged predicate, that the transformer or related equipment caused the fire, McGraw cited significant evidence indicating an arc flash that originated in or near the HV bushing—and then escaped the transformer through the ruptured bushing and destroyed the copper ground wire—produced sparks that ignited dry vegetation at the base of the utility pole. According to McGraw, molten copper from the wire and oil expelled from the transformer also contributed to the fire. The cited evidence included video and photographic evidence as well as the physical evidence discussed above, including the broken HV bushing, the ripped-apart, melted, and vaporized copper ground wire, and the burn marks and bubbling pattern inside the transformer tank. The fire marshal investigators generally concurred that the fire started as the result of "an unspecified electrical anomaly from the electrical distribution system," and they specifically noted the destroyed copper wire.

CenterPoint, however, argues that there was conclusive evidence that a ground fault from in or near the transformer could not have started the fire because the security camera continued to operate for 30 minutes after the fire began. CenterPoint insists that a fault powerful enough to cause the HV bushing to rupture

would have immediately cut off power to the camera. In support, CenterPoint cites the deposition testimony of William Rhodes, who was initially hired by Coleman as an expert in the case. Rhodes noted that the transformer could not have suffered a "catastrophic failure" because the camera kept working. In the excerpt provided, however, Rhodes did not say that an electrical fault did not occur, just that it was not "catastrophic." He did not define what he meant by "catastrophic" in this context. CenterPoint additionally notes that its own expert, Hautanen, disagreed with McGraw that the condition of the transformer after the fire indicated an electrical fault or arc flash had occurred within it, but of course, the jury was free to accept McGraw's conclusion over that of Hautanen. *See Golden Eagle Archery*, 116 S.W.3d at 761; *Gator Gone Safety Pilots*, 622 S.W.3d at 537. The jury was also able to see for themselves the photographs of the transformer as an aid for determining which expert was more credible.

CenterPoint next points out that Hautanen and its technicians testified that fuses clear almost instantaneously in response to faults and they had never heard of a fuse taking so long to clear. These witnesses did not testify, however, that it was impossible for a fuse to fail to clear in response to a ground fault. McGraw explained that the fuses could have simply delayed in clearing due to the amount of current involved, saying "in the case of a high resistance ground/flashover, it would have taken a little bit of time for that fuse to actually clear." CenterPoint criticizes McGraw for not offering "detailed support" for this observation and for not explaining how the fault could have been powerful enough to rupture the HV bushing and expel oil from the transformer but not clear the fuse. CenterPoint also asserts, without citing any evidence, that the fault's impact should have diminished over time and not increased after 30 minutes to clear the fuse. McGraw indeed acknowledged that he could not "definitively state . . . the exact reason" why the

26

camera continued to receive power, but such admission is not fatal to his testimony. It seems apparent that McGraw concluded that there was not enough information to know exactly why the fuse did not clear for 30 minutes and yet there was enough information, as he described in detail, to conclude that an arc flash originating in or near the HV bushing caused the fire. The fire marshal investigators generally concurred. The jury was free to accept McGraw's testimony and the investigators' conclusions over that of the CenterPoint witnesses, and we presume that they did so. *See Golden Eagle Archery*, 116 S.W.3d at 761; *Gator Gone Safety Pilots*, 622 S.W.3d at 537.

CenterPoint additionally notes that Hautanen testified the oil in the transformer would have burned off if there had been a fault, but again, the jury was free to discount his testimony and accept McGraw's that the physical evidence supported the conclusion that a fault had occurred in the transformer. Also, again, the jury was able to view the photographs of the equipment for themselves as an aid for assessing credibility. The evidence was legally and factually sufficient to establish that CenterPoint's equipment caused the fire on Coleman's property.

**Was there a defect in the transformer's components?** CenterPoint next argues that even if evidence supported the conclusion that a fault occurred, there was no evidence or insufficient evidence that the transformer or related equipment was defective. CenterPoint insists that Coleman needed and failed to detail exactly how the components were physically or mechanically defective or inadequate and whether each such defect or inadequacy existed at a point when CenterPoint could and should have discovered it.

As described by McGraw and others at trial, a key function of the electrical system and the equipment at issue in this case is the containment of electric current from the utility grid. The significant evidence that an arc flash occurred in or near

the HV bushing, the transformer and the ground system failed to contain the ground fault, and the fuse failed to clear is evidence that the equipment did not perform its intended function. McGraw explained that if such equipment is properly installed, inspected, maintained, repaired, and replaced, it would not have failed, the current would have been contained, and the fire would not have started. McGraw also noted how each component failed—there was an arc flash in or near the HV bushing, which also ruptured and broke the seal on the transformer; the fuse failed to clear; and the copper ground wire ripped apart, melted, and vaporized when exposed to voltage. McGraw explained that the ground system as designed and installed was inadequate for the voltage and should have been stronger and larger. While he otherwise did not specify what physical or mechanical defect existed in the other components that failed to perform their functions, this makes sense in light of his insistence that given the repeat problems, diagnostic testing was necessary before a catastrophic event could occur. CenterPoint does not cite to any evidence that specific mechanical or physical defects could have been determined after the fire, the components having been damaged by both their failures and the fire.

CenterPoint cites two cases in support of the proposition that it cannot be assumed the transformer was defective merely because a fire occurred: *Systech Financial Corp. v. Vaughn*, 558 S.W.2d 105, 105 (Tex. Civ. App.—Tyler, 1977), and *John R. Francis Building. Co. v. Bob Meador Co.*, 517 S.W.2d 693 (Tex. Civ. App.—Houston [14th Dist.] 1974, no writ). In both of these cases, however, the courts emphasized that there was no evidence establishing the cause of the fires and instead the plaintiffs relied on a stacking of inferences in attempting to prove the defendants' negligence. *Systech Fin.*, 558 S.W.2d at 105 (affirming directed verdict where jury apparently concluded defendant started fire in his apartment

because he was a smoker); *John R. Francis Bldg.*, 517 S.W.2d at 695 (holding that although negligence could be proven by circumstantial evidence, mere surmise or suspicion of negligence and a stacking of inferences was impermissible). In the present case, as discussed in detail above, there was significant evidence, including expert, video, and physical evidence, that the fire was started due to a failure of CenterPoint's equipment to properly function as a result of CenterPoint's failure to properly install, inspect, maintain, repair, and replace that equipment. The cited cases are inapposite.

CenterPoint additionally argues that it presented conclusive evidence that the equipment was not defective at the time of the fire because during the September 8, 2010 service calls, technicians replaced a couple of fuses and visually inspected some of the components. In relation to this assertion, CenterPoint emphasizes a portion of McGraw's testimony where he denied that he was asserting the HV bushing had a defect that technicians could have visually observed. CenterPoint also points out that McGraw admitted the transformer's core and coil remained functional even after the fire.

These arguments, however, ignore a key component of McGraw's testimony—that CenterPoint breached the duty of care, at least in part, because its technicians only performed a "cursory visual inspection" and failed to diagnostically test the transformer and HV bushing. According to McGraw, visual inspection was insufficient under the circumstances to discover the cause of the repeat problems, and without determining the cause of the problems, CenterPoint could not know how to remedy the issues. McGraw opined that simply replacing a couple of components and then placing the equipment back into service was not sufficient under the circumstances and violated the standard of care. He explained that in order to determine the root problem or problems, CenterPoint needed to

29

conduct diagnostic testing, such as Megger testing, and without such testing, CenterPoint would not know what to do to prevent further issues with the equipment and a potentially catastrophic "whoops."

CenterPoint's point about the core and coil remaining functional is irrelevant because McGraw acknowledged this in his testimony. He instead identified the HV bushing—the entry point for high voltage electricity from the electrical distribution system into the transformer—as the component that initially failed to contain the current. McGraw explained that there was "more than enough . . . evidence that there was a ground fault or a flashover on the top side of the transformer in and around the high voltage bushing" so that a flashover occurred without compromising the inside of the transformer. He further detailed that evidence and described at length how he was able to eliminate other potential causes of the fire such as the extension cords on the property. In short, McGraw's testimony and the evidence he cited in support was sufficient evidence that CenterPoint's equipment was defective or inadequate at a point when CenterPoint could and should have discovered it.

**Did CenterPoint negligently maintain the transformer?** CenterPoint next challenges the sufficiency of the evidence to prove that it negligently maintained the transformer. As it did in its jurisdictional arguments discussed above, CenterPoint begins this section of its brief by again misconstruing Coleman's theories as asserting CenterPoint negligently failed to (1) adopt a formal, proactive maintenance program for its transformers and (2) provide all of its service technicians with Megger devices and mandate the regular use of such devices in maintaining its transformers. And again, CenterPoint does not cite to where Coleman alleged either of these things. As set forth in detail above, McGraw essentially testified that CenterPoint negligently designed and installed a ground

system that was inadequate for the voltage involved and failed to conduct diagnostic testing in response to repeat problems with the same equipment so that it could determine and correct the cause of those problems. To the extent relevant to Coleman's actual theories, we will address the rest of CenterPoint's arguments.

CenterPoint notes that its technicians visually inspected the transformer during the power outage about five weeks before the fire and asserts they electrically tested the transformer when they restored power. As discussed above, however, McGraw explained that a visual inspection was inadequate under the circumstances, and CenterPoint does not cite any evidence that simply closing the fuse and restoring power would provide the same information regarding potential leakage currents or compromise to ground as would a Megger test or a "high potential test" of the transformer and HV bushing. McGraw explicitly disagreed that simply restoring power met the standard of care. CenterPoint also points out that the technicians trimmed nearby trees to eliminate one possible cause of the earlier power outage, but again, McGraw's testimony clearly indicated this was insufficient given the repeat problems the transformer had experienced.

Next, CenterPoint asks why they would have needed to determine the source of the ground fault that caused the prior power outage when Coleman's theory of how the fire began concerns a failure of the system to contain an arc flash. CenterPoint does not support this argument with further explanation or citation to the record. The clear implication of McGraw's testimony was that to meet the standard of care, CenterPoint needed to have diagnostically tested the transformer and HV bushing to ensure there was no leakage current or compromise to ground. He explained that failure to do so and to determine and correct the cause of the repeat problems most likely resulted in the fire. He additionally questioned the adequacy of the ground system, which he also identified as a cause of the fire.

31

CenterPoint argues both that McGraw failed to expressly state CenterPoint breached the standard of care by failing to conduct Megger testing and that he did so but failed to explain why it was necessary. To be clear, McGraw explained that diagnostic testing was required to meet the standard of care in order to determine and correct the cause of the repeat problems with the equipment and prevent a catastrophic "whoops" as occurred in this case. CenterPoint further notes McGraw admitted he was unaware of any utility that mandated regular Megger testing of its transformers. But McGraw did not assert CenterPoint was negligent for failing to regularly Megger test transformers, he faulted CenterPoint for failing to conduct diagnostic testing of the equipment under the circumstances of this case.

Lastly, CenterPoint cites *Simmons v. Briggs Equipment Trust*, 221 S.W.3d 109 (Tex. App.—Houston [1st Dist.] 2006, no pet.), for the undisputed proposition that the mere occurrence of a fire does not give rise to a presumption of negligence. After the plaintiff in *Simmons* was injured when a fire occurred in the engine compartment of a rail car mover that he was operating, he sued the company that was under contract to provide maintenance on the engine. *Id*. at 111. In affirming a no-evidence summary judgment favoring the defendant, the court of appeals explained that the mere fact that a ruptured hose was found in the engine compartment after the fire only created a surmise or suspicion of negligence and the plaintiff needed and failed to present expert testimony regarding the condition of the hose, whether the maintenance company had violated the standard of care, and what a reasonable maintenance company would have done under the circumstances. *Id*. at 115. Here, as discussed in detail above, Coleman presented expert testimony regarding the transformer and other equipment, that CenterPoint violated the standard of care, and that a reasonable utility company would have performed diagnostic testing on the equipment in response to the repeat problems

and would have installed an adequate ground grid in a dielectrically consistent manner for the applied voltages. Nothing in *Simmons* suggests the evidence in the present case was legally or factually insufficient.

CenterPoint has failed to establish that the evidence was legally or factually insufficient to support the jury's finding that CenterPoint breached a duty of care owed to Coleman. Accordingly, we overrule CenterPoint's second issue.

## 2. Proximate Cause

In its third issue, CenterPoint challenges the legal and factual sufficiency of the evidence to establish that CenterPoint's negligence proximately caused the fire. To establish proximate cause, Coleman was required to establish both cause-in-fact and foreseeability. *See Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 784 (Tex. 2001). A plaintiff proves cause-in-fact by showing that the alleged act or omission was a substantial factor in causing the injury without which the harm would not have occurred. *Id*. Foreseeability means that the defendant should have anticipated the danger that the alleged negligent act or omission created for others. *Id*. at 785.[8]

Here again, CenterPoint misconstrues Coleman's theory of liability and asserts that Coleman failed to offer evidence that a failure to (1) adopt a formal, proactive maintenance program for its transformers and (2) provide all of its service technicians with Megger devices and mandate the regular use of such devices in maintaining its transformers caused the fire and resulting damages. We

---

[8] The jury charge, which governs our analysis of the evidence, defined "proximate cause" as meaning

> a cause that was a substantial factor in bringing about an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that an entity using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

will again address CenterPoint's specific arguments to the extent relevant to Coleman's actual theory.

CenterPoint asserts that for evidence of cause-in-fact, Coleman relied exclusively on conclusory statements by McGraw that properly maintaining the transformer in some unspecified manner with some unspecified frequency would have prevented the fire. In support, CenterPoint cites to some of McGraw's more general statements, for example, that had CenterPoint properly installed, inspected, maintained, repaired, and replaced its equipment, the equipment most likely would not have failed, and the fire would not have started. CenterPoint also cites to cases in which courts held that expert testimony was insufficiently specific to establish cause-in-fact. *See Excel Corp. v. Apodaca*, 81 S.W.3d 817, 821–22 (Tex. 2002); *Oncor Elec. Delivery Co., LLC v. S. Foods Grp., LLC*, 444 S.W.3d 699, 712–13 (Tex. App.—Dallas 2014, no pet.); *Goss v. Kellogg Brown & Root Inc.*, 232 S.W.3d 816, 819–20 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). These cases are distinguishable, however, because here, McGraw did not just make the generalized statements regarding causation that CenterPoint cites but also offered specific explanations of how CenterPoint's failures were a substantial factor in causing the fire and how the fire most likely would not have occurred if CenterPoint had met the standard of care.

As discussed in more detail above, McGraw testified as to why and how CenterPoint needed to diagnostically test the transformer and HV bushing for leakage current or compromise to ground rather than just replacing a few components and putting the transformer back into service in response to repeated problems with the equipment. He indicated that doing so would have determined the cause of the ground fault and informed CenterPoint what needed to be done to remedy the issue. In regard to the ground system, he explained that it should have

34

been designed and installed in a dielectrically consistent manner for the voltages applied and should have been larger and stronger than it was and had it been so, the current would have been contained and the fire would not have occurred.

Evidence McGraw cited in support of his conclusions included the fire marshal investigators' report that largely supported his determination as to the cause of the fire, the remains of the destroyed copper ground wire, the broken HV bushing, the black carbon markings on the inside of the bushing and the transformer tank, the fact that two gallons of oil were expelled from the transformer, the bubbling pattern on the inside of the transformer tank, the video of the start of the fire, and the testimony of CenterPoint's technicians who stated that they only performed a cursory visual inspection of the equipment, traded out a couple of components, and trimmed some trees in response to the ground fault and power outage five weeks before the fire but did not diagnostically test the equipment because they did not have the tools to do so.

CenterPoint's expert, Hautanen, asserted the copper wire simply melted from the heat of the fire and the fire may have been caused by extension cords, but both of these conclusions were rejected by McGraw and the investigators based on the physical remains of the wire, the fact the fire would not have gotten hot enough to melt copper, and the fact that the extension cord breakers had not cleared. Although McGraw could have provided more details and specificity to help the jury's analysis, his testimony and supporting evidence was sufficient evidence of cause-in-fact.

CenterPoint additionally points to a couple of isolated references in McGraw's testimony that it argues renders the evidence on causation insufficient. The first comment came during the direct examination of McGraw when he was asked what would have been required "to keep that transformer in good working

35

condition and prevent a fire" and McGraw began his response by saying, "I can't speak to preventing the fire . . . ." Exactly what McGraw meant by that phrase is unclear, but shortly after this remark, McGraw directly indicated that had CenterPoint not breached the standard of care, the fire would not have occurred. As sole judge of the weight and credibility of the testimony, the jury was free to accept McGraw's clear, direct statements and discount this one unclear phrase. *See Golden Eagle Archery*, 116 S.W.3d at 761; *Gator Gone Safety Pilots*, 622 S.W.3d at 537.

The second McGraw comment also came during his direct examination when he acknowledged that "[e]verything fails. Everything ultimately fails. You and I will both fail, right?" Again, it is not entirely clear what relevance the off-hand remark has to the evidence of causation, and CenterPoint does not offer an analysis. McGraw certainly did not and was not required to testify that the equipment could not possibly have failed if maintained in proper condition. He testified instead that had CenterPoint properly installed, inspected, maintained, repaired, and replaced its equipment, the equipment most likely would not have failed, and the fire would not have started. The jury was free to disregard the remark.

The evidence was legally and factually sufficient to support the jury's finding that CenterPoint's negligence was the proximate cause of Coleman's damages. We overrule CenterPoint's third issue.

### 3. Lost Profits Damages

In its fourth issue, CenterPoint contends that Coleman failed to present factually sufficient evidence to support the award of lost profits damages, even as reduced by remittitur. Alternatively, CenterPoint contends the award was excessive. As discussed above, the jury found lost profits damages in the amount

36

of $3,633,917, but the trial judge subsequently reduced this to $2,763,435. Under this issue, CenterPoint seeks a new trial on both liability and damages. We will begin by examining the law and evidence related to lost profits and then will turn to CenterPoint's specific arguments.

**Governing law.** Both sides agree that to recover lost profits damages, Coleman was required to prove both the fact and amount of the loss by competent evidence with reasonable certainty. *See Horizon Health Corp. v. Acadia Healthcare Co., Inc.*, 520 S.W.3d 848, 859 (Tex. 2017). Although evidence sufficient to allow an exact calculation of lost profits is not required, lost profits estimates must be based on objective facts, figures, or data from which the lost profits may be ascertained. *Id*. Lost profits damages, however, may not be based on evidence that is speculative, uncertain, contingent, or hypothetical. *See Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994); *Carter v. Steverson & Co.*, 106 S.W.3d 161, 165 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). When evidence of damages is determined to be factually but not legally insufficient, a remittitur or a new trial may be in order, depending on the state of the evidence. *See ERI Consulting Engineers, Inc. v. Swinnea*, 318 S.W.3d 867, 880 (Tex. 2010).

**The evidence.** To prove lost profits, Coleman offered testimony from himself, his wife, and his employees; tax returns and financial statements; and the testimony of expert James Claywell, a CPA who specializes in business valuations and lost profits calculations. Coleman and other witnesses described the devastating effect the fire had on his car upholstery business. There was significant evidence that the business lost established wholesale clients and saw a dramatic and sustained loss of retail customers as a result of the fire. Prior to the fire, Coleman had plans to expand his business by developing another property to accommodate more business, and he had begun to put those plans into action,

having purchased a lot and had building plans drawn up. After the fire, those plans were put on hold and Coleman struggled to obtain and pay for services related to the development, including asphalt, plumbing, electricity, and building a permanent structure. Coleman and his wife testified that the business was disrupted for several years due to the fire and that the development of the other property took several years longer than planned.

Claywell testified regarding his qualifications and his investigation into Coleman's business, including reviewing tax returns and financial statements, corporate documents, marketing, and a narrative provided by Coleman and his wife. To project what would have happened had there been no fire, Claywell used "regression analysis," which he described as a statistical analysis that looks at past performance to project future expected performance. He said that according to the Colemans' narrative, they were "pretty much" completely out of the business for two years, but Claywell said they subsequently discussed the business lag may instead have been three years or as long as six years. Claywell explained that he did not personally assess the length of business lag and it was an issue for company management to decide and ultimately the jury. He noted, however, that two years after the fire, a foreclosure and other difficulties were ongoing, suggesting the lag was greater than two years.

Claywell identified important factors affecting his analysis, which included that the company's growth rate from 2007 until 2010 exceeded 31 percent annually; given the growth rate and property available as collateral, Coleman could have expected to qualify for a small business loan to begin developing the new property in 2011; and it took until 2018 before they were finally able to open the new building. Claywell calculated that if the business suffered a two-year business lag, the lost profits would total $1,680,013 and if the business suffered a three-year

lag, the lost profits would be $2,763,435. He said that he did not specifically calculate lost profits damages for a six-year lag, but he believed he had given the jury enough information for that amount to be calculated. Claywell criticized the analysis by CenterPoint's expert, Jeffrey Compton, because Compton failed to take the seasonality of the business into account; did not do "back transformations," which Claywell identified as a critical step in making lost profit calculations as accurate as possible; and did not consider "step" or semi-variable costs.

On cross-examination, Claywell acknowledged that as time goes by, it becomes more difficult to pin losses on a specific event. When pressed regarding what business lag estimate was more reliable, Claywell testified that he would rely on the two-year business lag because that was the estimate in the Coleman's written narrative and the period that they had originally thought it would be.

CenterPoint's financial expert, Compton, calculated lost profits damages based on a four-year business lag. He testified that he used two different methods of calculations and came up with total damages of between $240,000 and $300,000.

**CenterPoint's arguments.** CenterPoint first hones in on Claywell's statement that he thought the two-year lag was the most supportable because it was the period that the Coleman's had originally proposed in their written narrative. CenterPoint suggests that this comment rendered the evidence factually insufficient to support the trial court's award of $2,763,435, which according to Claywell, was the estimated lost profit damages for a three-year lag. CenterPoint interprets Claywell's testimony as indicating he could not accept a three-year lag in keeping with fair accounting practices. But that is not what Claywell said; while he suggested he found the two-year lag more reliable, he did not say that the three-year period was unacceptable or unreliable. Indeed, Claywell insisted he did not

39

personally analyze the length of the business lag and that it was an issue for company management and ultimately the jury. He also noted that a foreclosure and other ongoing difficulties suggested the lag was greater than two years. Although Claywell based his comment regarding the two-year lag being more reliable on the fact it was the period in the Colemans' narrative, he also said that in later discussions, the Colemans indicated the lag also could have been three years or as long as six years. As mentioned above, CenterPoint's expert found the business lag to be four years and Coleman himself testified the business was disrupted for up to eight years. CenterPoint offers no analysis of that testimony.

Neither the jury nor the court on remittitur was required to accept Claywell's suggestion that the two-year lag was more reliable. Claywell himself said that he did not analyze the length of business lag, and Coleman offered other evidence supporting a determination on the period of disruption. A jury is generally free to accept or reject all or any portion of an expert's testimony. *Gator Gone Safety Pilots*, 622 S.W.3d at 537; *see also McGailliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986) (explaining a jury has considerable discretion in evaluating opinion testimony from an expert on the amount of damages).[9]

CenterPoint next argues that the record does not contain objective facts, figures, or data from which the lost profits may be ascertained. In particular, CenterPoint argues that Coleman's tax returns and financial records, which were admitted at trial, do not by themselves support Claywell's lost profits estimates. However, while lost profits estimates must be based on objective facts, figures, or

---

[9] CenterPoint cites *Holland v. Hayden*, 901 S.W.2d 763, 766 (Tex. App.–Houston [14th Dist.] 1995, writ denied), for the proposition that lost profits damages cannot be based on the subjective and conclusory testimony of the plaintiff alone. This proposition, however, has no application in the present case where Coleman's lost profits damages evidence included substantial financial documentation, expert testimony, testimony from Coleman's wife and employees, in addition to testimony from Coleman himself.

data, *see Horizon Health*, 520 S.W.3d at 859, experts are not required to introduce foundational data supporting their conclusions unless the opposing party or trial court insists. *See* Tex. R. Evid. 705(a); *Horizon Health*, 520 S.W.3d at 865 (discussing rule in lost profits context); *Arkoma Basin Expl. Co. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 389-90 (Tex. 2008) (citing Tex. R. Evid. 705(a) and holding expert's testimony was not unreliable, speculative, conclusory, or insufficient to support the damages award merely because the foundational data underlying his opinions and referenced in his testimony was not in the record). Claywell's testimony was far more involved than CenterPoint's arguments acknowledge. Claywell walked the jury in detail through his calculations using the financial documents in the record as well as other financial information, his expert report and supplemental report, and demonstrative exhibits that were not offered into evidence. *See Arkoma Basin*, 249 S.W.3d at 389-90 (discussing expert's use of demonstrative exhibits).

Lastly, CenterPoint notes that its expert calculated total lost profits of between $240,000 and $300,000. But, of course, the jury was free to accept Claywell's testimony over that of Compton. *See Golden Eagle Archery*, 116 S.W.3d at 761; *Gator Gone Safety Pilots*, 622 S.W.3d at 537.

The evidence was factually sufficient to support the trial court's award of $2,763,435 in lost profits damages. We overrule CenterPoint's fourth issue.

### C. Damage to Personal and Business Credit

In its fifth issue, CenterPoint contends that the trial court erred in overruling its relevance objection to certain evidence offered by Coleman to prove past and future damages to personal and business credit. CenterPoint does not seek a new trial under this issue but, instead, argues that because this evidence was inadmissible and was the only evidence Coleman presented in support of these

damages, the damages award should be reversed and a take nothing judgment entered. The jury found and the trial court awarded $450,000 for past and $50,000 for future damage to personal and business credit.

The evidence CenterPoint cites is Coleman's testimony regarding a house that he owned that was foreclosed on and a boat that was apparently repossessed. Coleman, however, cites in his brief a host of other evidence that was offered to prove damages to personal and business credit, including, among other things, evidence that Coleman's credit score fell from the high 700s before the fire into the 400s afterwards; Coleman had purchased a lot, had building plans drawn up, and expected to qualify for a small business loan before the fire but after the fire, it was years later that his wife was able to get a loan to finance the new location; and Coleman had to "max out" his credit cards after the fire, was unable to pay the debt, and was sued by American Express.

Even in its reply brief, CenterPoint does not address this other evidence except to assert that damage to a person's credit rating is not recoverable as damage to personal and business credit. We decline to construct CenterPoint's argument regarding the other evidence for it. *See* Tex. R. App. P. 38.1(i); *Bhatia v. Woodlands N. Houston Heart Ctr., PLLC*, 396 S.W.3d 658, 666 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). We overrule the fifth issue.

## II. Coleman's Appeal

In a single issue in his appeal, Coleman asserts that the trial court erred in remitting a portion of the damages found by the jury. As stated, the jury found lost profits damages in the amount of $3,633,917, but the trial judge subsequently reduced this amount to $2,763,435. We review a trial court's order of remittitur under a factual sufficiency standard. *See Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 641 (Tex. 1987); *Carlton Energy Grp., LLC v. Phillips*, 535 S.W.3d 542,

552–53 (Tex. App.—Houston [1st Dist.] 2016, pet. denied).

Coleman begins his argument by offering boilerplate law on lost profits damages—which we discuss above under CenterPoint's fourth issue—and then listing alleged facts supported by a few citations to large, undifferentiated blocks of testimony. The listed facts include much of that already discussed above regarding lost profits, including expert Claywell's testimony that his job was to provide information from which the jury could then calculate damages, the annual growth rate for the business before the fire was over 31 percent, and Coleman expected to receive a business loan before the fire. Claywell provided specific lost profits estimates based on two- and three-year business lags (respectively, $1,680,013 and $2,763,435) but asserted he provided enough information for the jury to calculate lost profits for six years if necessary. Coleman asserts CenterPoint's expert testified a four-year lag was accurate and Coleman and his wife testified in support of business disruption lasting as long as eight years. Coleman particularly emphasizes his own testimony regarding his credit score, plans, lost business after the fire, and length of time it took to develop the new property.

After recounting the alleged facts in his brief, Coleman asserts that based on the evidence, the jury could have reasonably concluded there was a two-, three-, four-, five-, or six-year business lag. He then speculates that the jury found "approximately 4 years" of business disruption and suggests the jury extrapolated the lost profits figure it found from Claywell's two and four-year calculations along with the financial records.

Instead of offering any actual calculations in support of this speculation, however, Coleman simply reports that this is what members of the jury said they did after the trial. Coleman does not offer any proof of this claim. Even if we were able to accept this claim regarding the jury's rationale without proof, it does not

43

constitute evidence supporting the amount of lost profits damages found by the jury. As discussed above, lost profits damages must be proven by competent evidence with reasonable certainty. *See Horizon Health Corp.*, 520 S.W.3d at 859. Moreover, a party seeking lost profits damages must demonstrate one complete calculation of lost profits. *See ERI Consulting Engineers*, 318 S.W.3d at 878; *Univ. Gen. Hosp., LP v. Prexus Health Consultants, LLC*, 403 S.W.3d 547, 551 (Tex. App.—Houston [14th Dist.] 2013, no pet.). And that calculation must be based on net profits, not gross revenue or gross profits. *Univ. Gen. Hosp.*, 403 S.W.3d at 551. Other than suggesting the jury could have done it, Coleman does not attempt to show how the jury derived its figures with actual calculations. *See Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84–85 (Tex. 1992) (holding evidence was insufficient because it did not provide indication of how plaintiff determined lost profits damages).

Coleman has failed to establish that the trial court erred in ordering a remittitur of lost profits damages. Accordingly, we overrule his sole cross-issue.

### *Conclusion*

Having overruled all issues raised in CenterPoint's appeal and Coleman's cross-appeal, we affirm the trial court's judgment.

/s/  Frances Bourliot
     Justice

Panel consists of Justices Wise, Jewell, and Bourliot.

44