**Affirmed as Modified and Substitute Opinion filed June 20, 2013.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-11-00988-CV

---

**UNIVERSITY GENERAL HOSPITAL, LP AND ASCENSION PHYSICIAN SOLUTIONS, LLC, Appellants**

**V.**

**PREXUS HEALTH CONSULTANTS, LLC AND PREXUS HEALTH, LLC, Appellees**

---

**On Appeal from the 270th District Court
Harris County, Texas
Trial Court Cause No. 2009-77474**

---

## S U B S T I T U T E   O P I N I O N

We issued an opinion in this case on April 2, 2013, modifying the trial court's judgment to delete awards of lost profit damages and affirming the judgment as modified. Appellees subsequently filed a motion for rehearing. Without changing the disposition of the case, we deny the motion for rehearing,

withdraw our previous opinion, and issue this substitute opinion.

Appellants University General Hospital, LP ("University General") and Ascension Physician Solutions, LLC ("Ascension") appeal from a judgment rendered against them following a jury trial. Concluding that there is legally insufficient evidence to support the jury's awards of lost profit damages, we modify the trial court's judgment to delete those awards and affirm the judgment as modified.

## BACKGROUND

Appellees Prexus Health Consultants, LLC and Prexus Health, LLC (collectively "Prexus") provide healthcare management, administrative support, and consulting services to hospitals such as University General. On March 2, 2009, University General entered into a Professional Services Agreement ("PSA") with Prexus. Pursuant to the PSA, Prexus would provide three distinct services to University General: medical transcription, medical coding, and billing. On that same day, Ascension, which was responsible for the day-to-day operation of University General, entered into a Consulting Services Agreement ("CSA") with Prexus. Through the CSA, Prexus agreed to provide various consulting services related to the daily operation of University General. The term of both the PSA and the CSA was three years, with both expiring on March 2, 2012.[1]

On September 8, 2009, University General and Ascension terminated both the PSA and the CSA. In December 2009, Prexus filed suit against University

---

[1] Both the PSA and the CSA contain choice-of-law clauses providing that they are to be governed by Ohio law. Neither side has raised an issue on appeal addressing the choice-of-law clauses or arguing that Ohio law conflicts with Texas law. Thus, we need not address any choice-of-law issue, and we apply Texas law. *See 1993 GF P'ship v. Simmons & Co. Int'l.*, No. 14-09-00268-CV, 2010 WL 4514277, at *9 n.15 (Tex. App.—Houston [14th Dist.] November 9, 2010, no pet.) (mem. op.).

General, Ascension, and numerous other defendants not parties to this appeal. Prexus alleged University General had breached the PSA and Ascension had breached the CSA. Prexus sought damages for unpaid invoices for work already performed as well as damages for lost profits Prexus allegedly would have earned during the two-and-a-half years remaining under both agreements. The lawsuit went to trial before a jury on April 11, 2011.

The jury found that University General breached the PSA. The jury then determined that University General owed Prexus $146,000 for work already performed under the PSA and that Prexus suffered $900,000 in lost profits as a result of University General's breach. The jury also found that Ascension breached the CSA. The jury found that Ascension owed Prexus $608,005 for work already performed pursuant to the CSA and determined that Prexus experienced $1,200,000 in lost profits as a result of Ascension's breach. Finally, the jury determined that Prexus's reasonable and necessary attorneys' fees through trial were $107,000.

Contending the evidence was insufficient to support the award of lost profits under either contract, appellants moved for judgment notwithstanding the verdict. The trial court denied appellants' motion and rendered judgment in accordance with the jury's verdict. This appeal followed.

## ANALYSIS

Appellants' three issues on appeal challenge only the portion of the trial court's final judgment awarding Prexus lost profits. Because it is dispositive of this appeal, we need only reach appellants' second issue, in which appellants contend the evidence is legally insufficient to support the jury's awards of lost profits under the PSA and the CSA.

3

## I. Standard of review

If an appellant attacks the legal sufficiency of an adverse finding on an issue on which it did not have the burden of proof, the appellant must demonstrate on appeal that there is no evidence to support the adverse finding. *Price Pfister, Inc. v. Moore & Kimmey, Inc.*, 48 S.W.3d 341, 347 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). In conducting a legal sufficiency review, we must consider the evidence in the light most favorable to the appealed finding and indulge every reasonable inference that supports it. *2900 Smith, Ltd. v. Constellation NewEnergy, Inc.*, 301 S.W.3d 741, 745 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 821–22 (Tex. 2005)). The evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the decision under review. *Id.* This court must credit favorable evidence if a reasonable trier of fact could, and disregard contrary evidence unless a reasonable trier of fact could not. *Id.* The trier of fact is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Id.*

This court may sustain a legal sufficiency (or no evidence) issue only if the record reveals one of the following: (1) the complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence established conclusively the opposite of the vital fact. *Id.* at 745–46. Evidence that is so weak as to do no more than create a mere surmise or suspicion that the fact exists is less than a scintilla. *Kellmann v. Workstation Integrations, Inc.*, 332 S.W.3d 679, 684 (Tex. App.—Houston [14th Dist.] 2010, no pet.).

4

## II. Prexus's awards of lost profit damages are not supported by legally sufficient evidence.

Lost profits are damages for the loss of net income to a business. *Miga v. Jensen*, 96 S.W.3d 207, 213 (Tex. 2002). Broadly speaking, they reflect income from lost business activity, less any expenses that would have been attributable to that activity. *Kellmann*, 332 S.W.3d at 684. While the recovery of lost profits does not require that the loss be susceptible of exact calculation, the party seeking such damages must do more than show that it suffered some lost profits. *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 876 (Tex. 2010) (quoting *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992)). The amount of the loss must be shown by competent evidence with reasonable certainty. *Id.*

A party seeking lost profit damages need not produce documentary evidence in court supporting an award, but any opinions or estimates of damages must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained. *Id.* Conclusory or speculative evidence of lost profits cannot support an award. *See Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649–50 (Tex. 1994). A party seeking lost profit damages must demonstrate one complete calculation of lost profits. *Kellmann*, 332 S.W.3d at 684. That calculation must be based on net profits, not gross revenue or gross profits. *Id.*

### A. The evidence regarding lost profits

The judgment awards Prexus $900,000 in lost profits from the PSA and $1.2 million in lost profits from the CSA. In their second issue, appellants contend that the evidence is legally insufficient to support either award under the legal standards discussed above. Considering the evidence in the light most favorable to the awards, there were at most two witnesses who testified on the issue of Prexus's alleged lost profit damages: Dr. Ajay Mangal and Mike Griffin. Both testified as

5

fact witnesses, not experts.

Mangal testified that, in addition to being an ear, nose, and throat doctor, he is a partial owner as well as the Chief Executive Officer ("CEO") of Prexus. Mangal also testified that he was serving as the CEO of Prexus in 2009. Mangal informed the jury he had an MBA in general business. While he testified about numerous subjects during the trial, Mangal's testimony eventually turned to the subject of Prexus's lost profit damages. Mangal began his testimony on this subject by explaining that he was quite familiar with and worked closely with the company's financials, reviewing them before presentations to the board and analyzing pro formas for any new projects.

A bench conference then occurred during which the trial court, after ascertaining that Mangal had not been designated as an expert, ruled that Mangal would not be allowed "to offer any expert testimony about any damage model." Mangal then continued with his testimony.

Q.        Ajay, you have written some numbers on this chart, how has Prexus been damaged by [University General] terminating the PSA?

[Mangal].  I can speak in basic terms that I looked at the numbers, the PSA and CSA. And over three years, . . .

[Objection and ruling omitted]

[Mangal].  It would have - - just the revenue number would have been about $8 million revenue. Okay. That is not profit, just revenue, what we would have billed [University General] for those contracts and for the services for the three years.

          And our profit margin or contribution margin being - -

[Counsel].  Your honor, I also object that he is about to get into expert testimony.

The Court.   Sustained.[2]

Q.          Ajay, how much money have you lost as a result of defendant's breach of the PSA and the CSA?

[Objection and ruling omitted]

[Mangal].   About $2.4 million over three years.

[Objections and rulings omitted]

Q.          So when you say three years, you mean the two and a half years remaining on the contract, correct?

[Mangal].   Absolutely.

Q.          How did you get that number?

. . .

[Mangal].   We look at the revenue that is lost and so we know the income that is lost from new contracts.  And that is what I have to, as the CEO, look at that data and see what, you know, each contracts [sic] means to us as a company.

. . .

Q.          All right.  So for the damages for the breach of contract by [University General] and Ascension, what would those damages include?

[Mangal].   They would include loss of PSA and CSA for about two and a half years.

Q.          Okay. And what are the numbers?

[Objections and rulings omitted]

[Mangal].   $2.4 million.

Mangal's testimony then turned to a potential agreement Prexus was negotiating with Humble Surgical Hospital ("Humble Hospital"), a planned new hospital in the northern part of Harris County.  Prexus would later argue that the expected profit margin on this potential agreement could be used to calculate lost profits under the PSA and CSA.  Mangal's testimony focused on a pro forma

---

[2] On appeal, Prexus does not challenge any of the trial court's evidentiary rulings.

projecting the income Prexus expected to earn if the negotiations with Humble Hospital proved successful and Humble Hospital came into existence.

Q.          When you need to make sure it is profitable, is one thing you do is look at a pro forma to determine what you would expect to make in future years once you perform the contract?

[Mangal].   That's correct.

Q.          And from - - how do you look at a pro forma to determine that?

[Mangal].   Look at the income and expenses and the bottom line.

. . .

Q.          Sorry, Ajay.  As Prexus' CEO, did you do this in evaluating the Humble Hospital project?

[Mangal].   Yes.

Q.          And with whom did you participate in this effort with Prexus?

[Mangal].   Initially, Mike Griffin and Jerry Fye.

Q.          Exhibit 35, which is the pro forma, does it show the money that Prexus was to make over three years?

[Mangal].   Yes.[3]

Q.          And what does it say?

[Mangal].   We were expecting to collect about $13 million.

Mangal's testimony later turned back to the Humble Hospital negotiations.

Q.          Ajay, a while ago when you testified about the 13 million, is the 13 million your profit from the project?

[Mangal].   No, that is the revenue that we would have gotten from three years of the CSA and the PSA.

Q.          What is your profit?

---

[3] Plaintiff's Exhibit 35 is a document entitled: "Humble Surgical Hospital-Business Model and Assumptions."

| [Counsel]: | Objection, Your Honor. He is not qualified to give that testimony. |
| --- | --- |
| The Court: | Sustained. |
| Q. | You have testified that in your role as CEO, you know what your revenues are, correct? |
| [Mangal]. | That's correct. |

At that point, Prexus passed the witness. Following appellants' cross-examination, Prexus resumed questioning Mangal the next day. Once again, the questions were directed at the revenue and profit expected if the Humble Hospital negotiations proved successful.

| Q. | Yesterday, you told the jury through this Exhibit 35 that Prexus expected to make 13 million in revenue from [Humble Hospital]; do you remember that? |
| --- | --- |
| [Mangal]. | Yes. |
| Q. | Ajay, what is your profit margin on that revenue? |
| [Counsel]: | Objection, Your Honor, foundation, and also object on the grounds that his testimony was not timely disclosed in discovery. |
| The Court: | Overruled. |
| [Mangal]. | 32 percent based on our last year data. |
| Q. | I'm sorry, based on what? |
| [Mangal]. | Last year financials. |

Mike Griffin was the second witness whose testimony touched on the issue of Prexus's lost profits damages. Griffin served as Prexus's Chief Financial Officer and later left to help found another company that provides management services to University General.

While Griffin testified on many subjects, he was also asked about Prexus's alleged lost profit damages.

9

Q.    Won't [sic] don't you pull up, if you will - - if you'll go to Plaintiff's Exhibit No. 35. Exhibit No. 35, this is a proforma, I think you've heard about a little while ago that was prepared between Prexus and Humble Surgical Hospital; do you recall that?

[Griffin].    Yes.

Q.    Okay. And - - and I think Ajay's testimony was that you didn't ultimately prepare this exhibit 35, but you prepared the majority of the iteration that led to this, do you recall that?

[Griffin].    Yeah, I helped, definitely.

Q.    In fact, you prepared a lot of these numbers and projections; isn't that correct?

[Griffin].    I can't answer that 100 percent. I did a proforma for the project.

Q.    Right.

[Griffin].    But I don't know if this was the final and if the numbers were changed and whatnot, but I did definitely do a proforma.

. . .

Q.    There are some numbers there on that page. And if you add up some of those numbers, you come up with a number around $13 million. You heard Ajay testify to that yesterday?

[Griffin].    Yeah. I don't know where he's getting this number.

Q.    Look, if you will, at . . . the first three columns in Lines 3 through 5. Those would be part of the anticipated revenues. In other words, if you look at . . . transcription services, coding services and billing services for the three years, you would add those numbers together - -

[Griffin].    Got it.

Q.    - - to determine revenue for Prexus, correct?

[Griffin].    Got it.

Q.    Is that - - do you agree with that?

10

[Griffin].	Yes.

. . .

Q.	Okay.  And - - and in order to determine what profit Prexus would have made, you would have had to - - you have to apply a profit margin, right?

[Griffin].	That's correct.

Q.	Okay.  So whatever the profit margin is times the $13 million, that equals the amount of revenue that Prexus would have - - was supposed to have received according to the proformas from the [Humble Hospital] contract.

[Griffin].	Right.

. . .

Q.	Now, with respect to the damages that Prexus has suffered, . . . you heard the testimony from Ajay that the calculation for the two and a half years remaining on the contract was $2.4 million.  You heard that, correct?

[Griffin].	For revenue.

. . .

Q.	You heard Ajay's testimony that the amount of money that Prexus lost on the remaining two and a half years on the PSA and the CSA with [University General] was $2.4 million.

[Griffin].	Yes, I did.

Q.	Okay.  That was profit, correct, it's not revenue?

[Griffin].	I did factor that.

Q.	And do you disagree with that?

[Griffin].	I don't know the answer.  I wouldn't - - I wouldn't be able to tell you that number.

## B.	This evidence is legally insufficient to support any lost profit damages.

We conclude that this evidence is legally insufficient to support awards of lost profit damages to Prexus.  As explained above, the plaintiff seeking lost profits

11

damages bears the burden of providing a single complete calculation of lost profits, which reflects revenue from lost business activity less expenses that would have been attributable to that activity. *Kellmann*, 332 S.W.3d at 684. Prexus did not provide that calculation here. With respect to revenue, although documentary evidence is not required, Mangal's testimony includes no objective facts, figures, or data explaining *how* he arrived at his $8 million anticipated revenue figure. *See Szczepanik*, 883 S.W.2d at 650 ("There is nothing in the record to show how [the appellee] determined the amount of lost profits."); *Holt Atherton*, 835 S.W.2d at 84 ("[T]his testimony is legally insufficient because it does not provide any indication of how the Heines determined what their lost profits were."); s*ee also Glattly v. Air Starter Components, Inc.*, 332 S.W.3d 620, 635 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) (holding evidence of lost profits was legally insufficient because it did not establish that calculation was based on objective facts, figures, or data).

Mangal also did not discuss expenses, though he testified that Prexus "lost" $2.4 million as a result of appellants' breach of both the PSA and the CSA. It is far from clear that this figure represents lost profits (revenue minus expenses), but even if we assume it does, Mangal once again did not provide any objective facts, figures, or data explaining how he arrived at that amount. When asked how, he said that "[w]e look at the revenue that is lost and so we know the income that is lost." But lost revenue or lost income is not a proper basis for an award of lost profit damages. *Kellmann*, 332 S.W.3d at 684. We therefore hold that the testimony recited above does not provide a single complete calculation of Prexus's alleged lost profits.

The lack of a single complete calculation is further confirmed by the jury charge. The jury charge asked two lost profits questions. The first asked: "The amount [University General] agreed to pay Prexus for the [PSA] less the expenses

Prexus saved by not completing the [PSA]." The second lost profits question asked: "The amount Ascension agreed to pay Prexus for the [CSA] less the expenses Prexus saved by not completing the [CSA]." There were no objections lodged to either lost profits question. In this circumstance, we measure the sufficiency of the evidence according to the charge submitted to the jury. *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 221 (Tex. 2005); *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000).

The appellate record is devoid of any evidence demonstrating the expenses Prexus saved by not completing the PSA or the CSA. Nor is there any evidence from which the jury could determine how to apportion Mangal's figures, which addressed "the PSA and the CSA" together, in order to provide the separate damage answers for each agreement that the verdict form required. For these additional reasons, the evidence is insufficient to establish a single complete calculation of lost profits from either the PSA or the CSA. *See Kellmann*, 332 S.W.3d at 686; *Wiese v. Pro Am Serv., Inc.*, 317 S.W.3d 857, 863–64 (Tex. App.— Houston [14th Dist.] 2010, no pet.).[4]

We reject Prexus's argument that Griffin's testimony somehow confirmed the accuracy of Mangal's $2.4 million figure as Prexus's lost profits. Even if we accept Griffin's nebulous comment that he "did factor that" as confirmation he

---

[4] On rehearing, Prexus argues a remand is required because evidence of damages that are not segregated among claims is more than a scintilla of evidence of segregated damages. But the problem we have described above is a failure of proof, not a failure to segregate. In the case Prexus cites, the supreme court remanded because the jury had awarded lost profits to all four plaintiffs as a single lump sum, and two of the plaintiffs were not entitled to recover. *See Minn. Mining & Mfg. Co. v. Nishika Ltd.*, 953 S.W.2d 733, 738–39 (Tex. 1997). In this case, however, the jury charge segregated Prexus's damages, providing separate answer blanks for the PSA and CSA. The problem is that Prexus did not provide legally sufficient evidence of a complete lost profits calculation for either contract. Because Prexus's awards are neither unsegregated nor supported by legally sufficient evidence, *Nishika* does not require a remand. *Cf. id.* at 739 ("When supported by legally sufficient evidence, an unsegregated damages award . . . ordinarily requires a remand.").

believed the $2.4 million figure referred to profit rather than revenue, he went on to testify, when asked if he disagreed with that figure, that he did not know the answer and could not tell the jury that number. This testimony confirms nothing except Griffin's lack of knowledge on this subject.

During oral argument, Prexus suggested the $2.4 million number was based on the six months the PSA and the CSA were performed prior to appellants' breaches. While basing a lost profits calculation on historic performance may be acceptable in some circumstances, Mangal provided no testimony connecting his $8 million and $2.4 million numbers to Prexus's actual past performance under the PSA and the CSA. *See Spring Window Fashions Div., Inc. v. Blind Maker, Inc.*, 184 S.W.3d 840, 884 (Tex. App.—Austin 2006, pet. granted, judgm't vacated w.r.m.) (stating that while there is no one correct method to calculate lost profits, it is not enough to supply pieces of several different methods).

In an effort to establish a single complete calculation, and relying on the Texas Supreme Court's *ERI Consulting* opinion, Prexus points to Mangal's testimony that Prexus anticipated it would achieve a 32 percent profit margin if its negotiations with the nascent Humble Hospital ever came to fruition. *See ERI Consulting*, 318 S.W.3d at 876–77. Mangal testified the 32 percent figure was based on the prior year's financials. Even if we assume the number is accurate, it was linked only to the profits Prexus estimated it would receive if and when its *contract with Humble Hospital* was performed. There is no evidence in the record, from Mangal or any other witness, providing a link between this expected 32 percent profit margin figure and the profit margin Prexus was earning on its *PSA with University General* or its *CSA with Ascension*. In other words, no one testified about the profit margin Prexus was earning on the two existing contracts at issue here, and there is no evidence that the potential contract with Humble

14

Hospital was sufficiently similar to each of those contracts that Prexus would earn the same profit margin on all three of them.[5]   As a result, we conclude the anticipated Humble Hospital profit margin cannot serve as a basis for the required single complete calculation of lost profits from the PSA and CSA.  *See Exel Transp. Servs., Inc. v. Aim High Logistics Servs., LLC*, 323 S.W.3d 224, 234 (Tex. App.—Dallas 2010, pet. denied) (holding that evidence of lost profits must be connected to the lost profits actually alleged to have been lost as a result of the defendant's conduct).

On rehearing, Prexus argues for the first time that there is sufficient evidence linking the contracts, and it cites evidence it did not address in its pre-submission brief.  Appellate courts generally do not consider arguments raised for the first time on rehearing.  *AVCO Corp. v. Interstate Sw., Ltd.*, 251 S.W.3d 632, 676 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (supp. op. on reh'g).[6]  Nevertheless, even these new record citations do not alter our conclusion that Prexus offered no evidence linking the contracts.

Specifically, Prexus now points to testimony that: (1) the Humble Hospital pro forma was indicative of the type of pro forma that Mangal reviewed in evaluating whether to enter into a project; (2) University General and Humble Hospital had some common shareholders; and (3) in creating a pro forma, Griffin

---

[5] On rehearing, Prexus argues that its evidence of lost profits is nevertheless sufficient under *ERI Consulting*.  But the failure of proof we have identified above concerns an issue that was not presented in *ERI Consulting*.  The sole owner of ERI Consulting testified to its profit margin on an existing contract with Merico, and the supreme court held this testimony sufficient to support an award of lost profit damages on that same contract.  *ERI Consulting*, 318 S.W.3d at 876.  In this case, however, Prexus is attempting to support its awards of lost profit damages by citing the profit margin it anticipated earning on a *different* potential contract without tying that margin to the contracts at issue.

[6] Moreover, we are not required to make an independent search of a voluminous record for evidence supporting a party's position.  *See* Tex. R. App. P. 38.1(i), 38.2(a); *Hakemy Bros., Ltd. v. State Bank & Trust Co.*, 189 S.W.3d 920, 927–28 (Tex. App.—Dallas 2006, pet. denied).

would "find out the volume that [the different physician specialists] could potentially bring into a center like that," would "use the net revenue data that we had on other centers," and "had a whole mechanism to screen to determine the expense structures." This testimony is no evidence that Prexus's expected profit margin on the Humble Hospital contract was the same as its existing profit margin on either the University General or the Ascension contracts. Whether Prexus used a certain type of pro forma to evaluate a potential project says nothing about whether that project's profitability will be the same as established projects, even if the projects have some common shareholders. In addition, Griffin helped create the Humble Hospital pro forma, but he did not prepare the final version and did not know if the numbers had changed. Nor did he say that the net revenue data he used in earlier versions came from the University General and Ascension contracts specifically. Yet even if it did, there is no evidence that the physician specialists included in the Humble Hospital pro forma had the same profitability as those practicing at University General, or that the expense screening mechanism used in the pro forma matched the expenses Prexus was incurring on the University General and Ascension contracts. For these additional reasons, the Humble Hospital pro forma does not provide sufficient evidence to support the jury's awards of lost profits on the University General and Ascension contracts.

Finally, we reject Prexus's argument that we must accept the $8 million and $2.4 million figures as conclusive evidence of Prexus's lost profits because appellants had the burden to come forward with contradictory evidence and failed to meet that burden. In support of this contention, Prexus once again cites *ERI Consulting*. 318 S.W.3d at 877 n.5. In *ERI Consulting*, the Supreme Court of Texas stated that "the defendant properly bears the burden of providing at least some evidence suggesting that an *otherwise complete* lost profits calculation is in

fact missing relevant credits." *Id.* at 878 (emphasis added). That is not the situation here because we have already held that Prexus did not provide a complete lost profits calculation. Because Prexus never met its burden to introduce evidence of a single complete calculation of lost profits, the burden never passed to appellants to come forward with contradictory evidence.

For these reasons, we conclude the evidence is legally insufficient to support the judgment's awards of lost profit damages to Prexus. Therefore, we sustain appellants' second issue on appeal.

## III. The proper remedy is to modify the judgment to delete the lost profit damages, not to remand.

Generally, the proper legal remedy for legal insufficiency of the evidence is rendition of judgment for the appellant. *Vista Chevrolet, Inc. v. Lewis*, 709 S.W.2d 176, 177 (Tex. 1986). Despite that general rule, Prexus asserts that, at most, appellants are entitled to a remand for a new trial. In support of this contention, Prexus cites numerous cases for the proposition that when there is legally sufficient evidence of some ascertainable amount of damages, but not the amount awarded by the jury, a take-nothing judgment is not proper. *See, e.g., ERI Consulting*, 318 S.W.3d at 880. We disagree that we are presented with such a situation. Instead, as we have explained above, we have a situation where there is no competent evidence establishing any amount of lost profits with reasonable certainty. *Cf. id.* at 877–78 (holding remand required if plaintiff's evidence is legally sufficient "to prove a lesser, ascertainable amount of lost profits with reasonable certainty"). In that situation, the general rule requires that we render judgment that Prexus take nothing on its lost profits claims against appellants. *See Kellmann*, 332 S.W.3d at 686–87.

## CONCLUSION

Having sustained appellants' second issue, we modify the final judgment to delete (1) the award of $900,000 in lost profits as a result of University General's breach of the PSA, and (2) the award of $1,200,000 in lost profits as a result of Ascension's breach of the CSA. We affirm the judgment as modified.


/s/    J. Brett Busby
         Justice


Panel consists of Justices Frost, Boyce, and Busby.