# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00447-CV

---

**John and Sally Kosmatka, Appellants**

**v.**

**Motostalgia, LLC; Antonio Brunet; and Motoreum, LLC, Appellees**

---

### FROM THE 53RD DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-19-008679, THE HONORABLE MARIA CANTÚ HEXSEL, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

John and Sally Kosmatka appeal the judgment rendered after a bench trial that they take nothing on their claims against Motostalgia, LLC; Antonio Brunet; and Motoreum, LLC. The Kosmatkas challenge findings and conclusions underlying the judgment on their breach-of-contract claim arising from the sales of antique vehicles. We will affirm the judgment.

## BACKGROUND

The Kosmatkas' five antique vehicles were the subject, directly or indirectly, of three agreements or sets of agreements with Motostalgia: the First Consignment Agreement, dated March 3, 2015; the five Second Consignment Agreements (one per car) dated March 22, 2015; and the Final Financial Agreement, dated January 15, 2018. Other documentary evidence included bills of sale and emails between the Kosmatkas and Brunet. Motostalgia and Motoreum are companies owned at least in part by Brunet. Sally Kosmatka testified that Motostalgia is an auction company and that Motoreum is a building where cars were sold.

**The consignment agreements**

The First Consignment Agreement is a handwritten document that lists five vehicles, assigns them values, and sets out consignment terms. Sally Kosmatka and Brunet testified that the page contains handwriting from each of them. The Kosmatkas listed the vehicles and their values as:

| | |
|---|---|
| 1932 Cadillac | $250,000 |
| 1938 Cadillac | $50,000 |
| 1933 Cadillac | $40,000 |
| 1923 Milburn Electric | $50,000 |
| 1908 Reo | $40,000 |

The latter two prices have an interlineated notation of "presold."[1] The assigned values of the five cars total $430,000. The agreement states that the Kosmatkas agreed with "Brunet of Motostalgia" to offer those cars for auction on June 12, 2015, in Indianapolis with the agreement that "Motostalgia will guarantee the minimum net amount of $410,000 for the 5 vehicles in this list and the agreement that if the vehicles reach a total of above $451,000 all amounts above that will be split 50% to the Kosmatkas and 50% to Motostalgia." Sally Kosmatka agreed that Motoreum did not appear on the document. She testified that the "Consignment Agreement" heading and the terms for what they would receive, including the provisions for amounts that exceeded $451,000, were in Brunet's handwriting. Sally Kosmatka agreed that the First Consignment Agreement did not speak of Brunet or his companies taking possession of the vehicles or the titles. The Kosmatkas' and Brunet's signatures are under the date 3/3/2015. Beyond the signature lines are a list of "amounts toward the purchase of the 1908 Reo 1938 Cadillac V16 1923 Milburn"; the list

---

[1] Brunet testified that the presale offer was the sale price of the Reo, but that the auction produced higher bids for the Milburn.

details payments of cash and checks in amounts ranging from $3,000 to $10,000 beginning in March 2015 and continuing irregularly through August 2019.

Sally Kosmatka testified that she and her husband believed the cars to be worth $430,000, while Brunet believed them worth $410,000, which is why the First Consignment Agreement guaranteed the Kosmatkas $410,000. She believed that they were entitled to receive at least $410,000 and testified that she was not told before signing this agreement that the cars would have to sell at auction before they could collect the guaranteed $410,000. She testified that she did not believe that the cars would have to sell before Motostalgia's payments were due; consistent with that, Brunet was paying the Kosmatkas before taking the cars to the auction. She testified that he made the first payment on March 22, 2015, and may have taken the vehicles and titles that day. She said that, when Brunet made a payment, he wrote the amount paid on the agreement, the Kosmatkas signed acknowledgment of that payment, and Brunet took a photo of the new writing on the agreement.

Brunet described the March 3, 2015 First Consignment Agreement as "notes to the agreement that was signed at the time the cars were picked up" on March 22, 2015. Brunet denied that Motostalgia agreed to pay $410,000 for the vehicles, asserting that it agreed to sell the vehicles and would "guarantee" the $410,000 if the sales supported that amount. Brunet testified that he explained "verbally" to John Kosmatka the possibility that they would receive less than $410,000 "in extreme detail."

The Second Consignment Agreements are a collection of forms on Motostalgia letterhead with the Kosmatkas' names signed beside the date March 22, 2015. Entitled "Consignment & Selling Agreement," the documents provide detail on the vehicles and a page of preprinted terms and conditions. There is one agreement per vehicle. Consistent with the list on

3

the First Consignment Agreement, the vehicles include a 1908 Reo, a 1923 Milburn Coupe Sedan, a 1932 Cadillac convertible, a 1933 Cadillac coupe, and a 1938 Cadillac limousine. Each agreement includes details like vehicle identification numbers, description, and history. In the "Agreed Selling Commission" blank on each agreement there is a handwritten "10% commission fee. 90% towards assembling and fixing cars to running and saleable condition." In the blank for "Reserve amount (USD)" immediately below the selling commission line, there is a handwritten note "10% of hammer price to consignor no reserve." The preprinted terms and conditions include representations that the signatories agree to be bound by those provisions and that Motostalgia "pays the seller when payment is received and confirmed from the buyer. . . . Seller checks are then mailed within 5-7 business days." Further, "Seller affirms that all information and descriptions of the consigned vehicle are accurate and no misrepresentation has occurred."

Sally Kosmatka testified that she had never seen those agreements before discovery in this lawsuit. She said that, though the signature on each was hers, she thought they looked like they and the printed names "came off of the original consignment agreement."[2] Brunet said he watched both Kosmatkas sign all five agreements. An employee of Brunet's companies, Andrea Hedlund, testified that she accompanied Brunet to the Kosmatkas' property and saw them sign the First Consignment Agreement and the Second Consignment Agreements.

Brunet testified that the Second Consignment Agreements were either given to or discussed with the Kosmatkas when the First Consignment Agreements were signed on March 3, 2015, even though the Second Consignment Agreements were not signed until March 22, 2015. He said that "it's understood that we can only pay up to the amount that the cars are sold for." He

_____

[2] While the First Consignment Agreement bears the Kosmatkas' signatures, nowhere are their names hand-printed as they are on the Second Consignment Agreements.

4

said that the agreements did not specify what happens when the auction price is less than the "minimum" because "it's an assumption that whenever you hire an agent to be sold the cars on a consignment agreement, I can only provide the sellers up to the amount that we sell the vehicles for." He called it an "auction guarantee," which is "up to the amount including our commissions. So we were not going to take any seller commission up to that amount." He testified that these terms were explained in the Second Consignment Agreements "that specifically explained all the details of a consignment before the vehicles were picked up and soon after these notes that we did in person in handwriting" in the First Consignment Agreement. He denied agreeing to pay $410,000 for the vehicles, saying instead that "Motostalgia agree[d] to sell the vehicles, and if the funds are up to that point, including our seller commissions, that's the amount that they would receive." Brunet testified that the Second Consignment Agreements memorialized the terms of the agreement he had discussed on March 3 with the Kosmatkas when the First Consignment Agreement was signed.

Brunet testified that he began making payments to the Kosmatkas when the Second Consignment Agreements were signed. He said that providing such compensation in advance of expected sales was "industry standard." He "knew" that he would receive at least $5,000 for the five vehicles, so he began paying the Kosmatkas at least $5,000 weekly after he took the cars and before the auction. Brunet conceded that the "installment" payments to the Kosmatkas did not conform with the provisions of the Second Consignment Agreements stating that Motostalgia would pay the seller when payment was received and confirmed from the buyer. He testified that Motostalgia started payments to the Kosmatkas before receiving money from even the "presold" buyers and paid the Kosmatkas in installments as they requested for "tax benefits."

5

**The Financial Agreement**

The Financial Agreement, dated January 15, 2018, is a handwritten document memorializing a payment plan between the Kosmatkas and "Motostalgia, represented by Antonio Brunet, regarding the sale of antique and classic cars (in particular the 1932 V12 Cadillac Victoria Convertible) by John and/or Sally Kosmatka to Motostalgia." The agreement states that "[i]t is agreed that Motostalgia will make a cash payment of $6,500.00 a month during the first week of every month to John and/or Sally Kosmatka." These payments "will continue until the sum of $225,750.00, currently owed by Motostalgia to John and/or Sally Kosmatka has been paid off." Further, "Antonio Brunet, representing Motostalgia, has agreed that, when other funds become available, Motostalgia will make payments in addition to the $6,500.00 per month." The agreement is signed by the Kosmatkas and "Motostalgia (Antonio Brunet)."

Sally Kosmatka testified that Brunet's failure to pay installments as he had been paying prompted her to draft the Financial Agreement. She wrote "Draft Financial Agreement" and sent it to Brunet, and he signed it, after which she scratched out "Draft" and inserted "Final." She concurred that the Financial Agreement does not mention providing title or delivery of vehicles because those events had already occurred. She agreed that Motoreum did not appear on the document.

Brunet testified that he signed the Financial Agreement because he is "an empathetic person" and was fond of the Kosmatkas. He said Sally Kosmatka was crying and John was sick, so he signed the document without reading it fully. Though the document states that he would have to pay $6,500 per month until the sum of $225,750 was paid, Brunet testified that he believed that his payments owed would be limited by the amount received for the sales; two cars—sold in April and May 2018—were still unsold when he signed the Financial Agreement in January

6

2018. Brunet agreed that as of January 2018 he had paid $184,250 to the Kosmatkas. He testified that he stopped making payments in 2019 because he had paid all he owed to the Kosmatkas.

**Other documentary evidence**

The record also contains **bills of purchase and invoices** for the vehicles. Three of the vehicles sold at the Indianapolis auction and the 1932 and 1933 Cadillacs sold separately years later. The documents bear the Motostalgia logo and list one or both Kosmatkas as the seller and various individuals or entities other than Motostalgia as the buyer. The invoices individually list the following hammer prices, commissions, and totals due for one of the five vehicles:

| Vehicle | Hammer price | Buyer commission | Total due |
| --- | --- | --- | --- |
| 1908 Reo | $ 75,000 | $ 2,250 | $ 77,500 |
| 1923 Milburn | $ 62,000 | $ 6,200 | $ 68,200 |
| 1932 Cadillac | $ 150,000 | $ 0 | $ 150,000 |
| 1933 Cadillac | $ 25,000 | $ 0 | $ 25,000 |
| 1938 Cadillac | $ 42,500 | $ 4,250 | $ 46,750 |
| total | $ 354,500 | $ 12,700 | $ 367,200 |

Though the Kosmatkas attended the 2015 Indianapolis auction, Sally Kosmatka testified that she did not remember being presented bills of sale showing the purchase of the three vehicles that sold at the auction.

Brunet said that the 1932 Cadillac did not sell at the auction in part because it had a V12 engine though the Kosmatkas had been told that it was a V16 prototype; they also had no documentation or other support for the claim that it was a V16 Cadillac prototype. Brunet testified that no bids were made on the 1933 Cadillac. Brunet testified that the Kosmatkas approved Motostalgia retaining the unsold vehicles so that he could attempt to find buyers. He said that he held the titles to all of the cars in escrow until a transfer could be made between the Kosmatkas

and the buyers. He said that he had to store the vehicles indoors at a facility owned by Motoreum and ship them in an enclosed trailer because they are delicate; he testified that the storage and transport costs totaled about $35,000. He took both cars to two additional auctions where they did not sell. The remaining Cadillacs sold individually via what Brunet called "private treaty" through auction houses in April and May 2018. Brunet testified that the 1932 Cadillac sold for more than V12s from that year, but less than a V16 prototype would have because of the lack of proof of the prototype status. He said that the 1933 Cadillac was not running, which hurt its value. He said that Motostalgia has made no profit from these transactions.

Sally Kosmatka testified, "The total amount out of the original $410,000 that he still owes us is $114,750." She testified that Brunet is not owed any offsets or credits. She said she knew that Brunet wanted to charge them for the expenses of moving the cars to the auction but that they never signed any documents saying that they were responsible for such because "when he took the cars from us, he was buying them. We're not responsible for anything." She testified that neither the First Consignment Agreement nor the Financial Agreement permitted Brunet to deduct any amounts from the $410,000, and that they never otherwise agreed that he could. They received payments from both Motostalgia and Motoreum and received checks and cash. She believed that the last payment they received from one of the appellees was on September 26, 2019.

The Kosmatkas and Brunet exchanged **emails** in November 2019. The Kosmatkas inquired regarding why payments had stopped and asking whether he intended to continue making payments. They asserted, "Since March 2015, you have paid $295,250 out of the $410,000 owed, which leaves a balance of $114,750." Brunet responded by email explaining why the cars sold for less than $410,000 and what amounts he was allowed to deduct from the actual sales proceeds. He said that the car sales generated $367,200 and agreed that he had paid the Kosmatkas $295,250. He said that the 1932 Cadillac was not a prototype V16 as the Kosmatkas had believed and represented, so it took longer to sell with more shipping and storage costs and brought less money than expected. He claimed $17,700 in expenses to ship the cars to Indianapolis for auction, to return the 1932 and 1933 Cadillacs to Texas, then ship them to and from California in a failed attempt to sell them there; he also claimed $18,600 in additional storage fees for the two slow-selling cars. He claimed there were additional expenses in preparing the cars for sale plus advertising and labor—expenses he did not quantify. He wrote that his family's struggles and medical challenges "do not impact our commitment and good faith to do what is right and fair. After all direct expenses the math is as follow[s].

| | |
|---|---|
| Total Amount of Sales | $ 367,200.00 |
| Amount paid up to Date | $ 295,250.00 |
| Direct expenses | $ 36,300.00 |
| **Remaining Amount** | **$ 35,650.00"** |

He concluded, "Hope this sounds agreeable and fair and we can conclude our dealings in good terms . . . ." Brunet deemed this email a "settlement offer." He said he was offering to pay the Kosmatkas all proceeds of the sales of the five vehicles minus the direct expenses even though he did not believe he owed them that much. He undisputedly made no more payments.

9

**The lawsuit**

The Kosmatkas sued on several causes of action including breach of contract. The parties disputed which agreement(s) were valid and which should control the transaction. Sally Kosmatka denied signing the Second Consignment Agreements, and Brunet contended that the Financial Agreement lacked consideration. The parties agree that the vehicles were sold to various buyers for a total of $367,200 and that the Kosmatkas have been paid a total of $295,250. The parties disputed how much (if any) remains due to the Kosmatkas.

The trial court concluded that the consignment agreements were not harmonizable and that the Second Consignment Agreements controlled. The court also concluded that the Financial Agreement was invalid because the Kosmatkas provided no consideration for it. The trial court held that the Kosmatkas take nothing by any of their causes of action and also that appellees were not entitled to an award of attorney's fees.

## APPLICABLE LAW

On appeal, the Kosmatkas focus their challenge of the judgment on their breach-of-contract claim, attacking findings and conclusions underlying the trial court's take-nothing judgment on that claim.

To show a breach of contract, the plaintiff must prove that (1) an offer was made; (2) the other party accepted in strict compliance with the terms of the offer; (3) the parties had a meeting of the minds on the essential terms of the contract (mutual assent); (4) each party consented to those terms; and (5) the parties executed and delivered the contract with the intent that it be mutual and binding. *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018). A contract must be supported by consideration—a present exchange bargained for in return

for a promise. *Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 460 (Tex. App.—Austin 2004, pet. denied). Consideration "consists of either a benefit to the promisor or a detriment to the promisee." *Id.* (quoting *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991) (internal citations omitted)). A contract modification must satisfy all the essential elements of a contract. *Hathaway v. General Mills, Inc.*, 711 S.W.2d 227, 228 (Tex. 1986); *Pointe W. Ctr., LLC v. It's Alive, Inc.*, 476 S.W.3d 141, 152 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). There must be both a meeting of the minds and new consideration to support the modification. *Hathaway*, 711 S.W.2d at 228; *It's Alive*, 476 S.W.3d at 152.

A novation occurs if a contract evidences an intention to relinquish and extinguish pre-existing claims and rights of action. *CTTI Priesmeyer, Inc. v. K & O Ltd. P'ship*, 164 S.W.3d 675, 681 (Tex. App.—Austin 2005, no pet.), *overruled on other grounds by Elness Swenson Graham Architects, Inc. v. RLJ II-C Austin Air, LP*, 520 S.W.3d 145, 165 n.7 (Tex. App.—Austin 2017, pet. denied) (en banc). The party claiming a novation must prove 1) the validity of the previous obligation; (2) an agreement among all parties to accept a new contract; (3) the extinguishment of the previous obligation; and (4) the validity of the new agreement. *CTTI*, 164 S.W.3d at 681 (citing *Vickery v. Vickery*, 999 S.W.2d 342, 356 (Tex. 1999); *Fulcrum Central v. AutoTester, Inc.*, 102 S.W.3d 274, 277 (Tex. App.—Dallas 2003, no pet.)). A court may infer that a new agreement is a novation of an earlier agreement when the new agreement is so inconsistent with the earlier agreement that the two agreements cannot subsist together. *CTTI*, 164 S.W.3d at 681; *Fulcrum*, 102 S.W.3d at 277.

We subject the trial court's findings of fact to the same standards of review applied to jury verdicts. *See Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *see also Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991) (explaining that trial court's findings of fact have

11

"same force and dignity as a jury's verdict upon questions"). We "defer to the trial court's findings of fact—so long as they are supported by the record—and review conclusions of law de novo." *Southwestern Elec. Power Co. v. Lynch*, 595 S.W.3d 678, 683 (Tex. 2020); *see Reliance Nat'l Indem. Co. v. Advance'd Temps., Inc.*, 227 S.W.3d 46, 50 (Tex. 2007) ("Appellate courts review legal determinations de novo, whereas factual determinations receive more deferential review based on the sufficiency of the evidence."). We will uphold the trial court's conclusions if the judgment can be sustained on any legal theory supported by the evidence. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).

In conducting a legal-sufficiency review, we consider the evidence in the light most favorable to the challenged findings and indulge every reasonable inference that supports them. *University Gen. Hosp., L.P. v. Prexus Health Consultants, LLC*, 403 S.W.3d 547, 550 (Tex. App.—Houston [14th Dist.] 2013, no pet.). The evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the decision under review. *Id.* at 551. We credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id.* When a party attacks the legal sufficiency of an adverse finding on an issue on which it had the burden of proof, it must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam). When a party challenges the legal sufficiency of the evidence on a finding on which it did not bear the burden of proof, the party must show that no evidence supports the finding. *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 215 (Tex. 2011).

When a party attacks the factual sufficiency of the evidence to support an adverse finding on which it had the burden of proof, it must demonstrate on appeal that the adverse finding

is against the great weight and preponderance of the evidence and that the verdict is clearly wrong, unjust, or manifestly erroneous. *Id.* at 242; *Nelson v. Najm*, 127 S.W.3d 170, 174 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). We examine the entire record, considering both the evidence in favor of and contrary to the challenged findings. *See Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406-07 (Tex. 1998); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). We consider and weigh all the evidence in a neutral light, and we can set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Ellis*, 971 S.W.2d at 407; *Cain*, 709 S.W.2d at 176. When a party challenges the factual sufficiency of evidence supporting an adverse fact finding for which it did not bear the burden of proof at trial, it must show that the evidence as a whole is so weak as to make the finding clearly wrong and manifestly unjust. *In re Marriage of Thrash*, 605 S.W.3d 224, 230 (Tex. App.—San Antonio 2020, pet. denied).

## DISCUSSION

The Kosmatkas contend that the Financial Agreement is the currently binding contract between the parties under which Motostalgia owes them payments. They challenge the evidentiary support for two findings: (1) that the parties intended the Second Consignment Agreements to substitute for and discharge the obligations of the First Consignment Agreement and (2) that the Financial Agreement contained no performance obligation owed by the Kosmatkas and no benefit to be conferred on Motostalgia. They contend that the conclusion that the Financial Agreement lacked consideration and is not enforceable is incorrect. They contend that the Financial Agreement's validity is shown by its statement that Motostalgia is responsible for $225,750 and the fact that it is the last-executed of the agreements, taking precedence over the

13

previously executed consignment agreements. The Kosmatkas also contend that the record supports each element of their breach-of-contract claim.

We note initially that, though Brunet testified that the First Consignment Agreement was merely notes in preparation for the Second Consignment Agreements, no party challenges its validity as a contract between the parties. The issues on appeal are different aspects of the questions whether the Second Consignment Agreements replaced or were a novation of the First Consignment Agreement, and whether the Financial Agreement replaced all previous agreements between the Kosmatkas and Motostalgia.[3]

**The record supports the conclusion that the Second Consignment Agreements control.**

The trial court found that the terms of the First Consignment Agreement and the Second Consignment Agreements are so inconsistent that "the two agreements cannot subsist together." It further found that the Second Consignment Agreements "demonstrate an intention and agreement by the Kosmatkas and Motostalgia that the obligations of the [Second] Consignment Agreements substituted for and operated as a discharge of the obligations of the [First] Consignment Agreement."

The March 22, 2015 Second Consignment Agreements collectively concerned the five cars listed in the March 3, 2015 First Consignment Agreement. Whereas in the First Consignment Agreement, the Kosmatkas agree to offer the listed cars for auction in Indianapolis, the Second Consignment Agreements do not specify the place or time of the sale but do

---

[3] All of the signed agreements were expressly between the Kosmatkas and Motostalgia, represented by Brunet. Motoreum is not party to any of the agreements even though checks were drafted on a Motoreum account to pay the Kosmatkas. The Kosmatkas seek to impose liability on all appellees, but on the facts and claims on appeal, imposition of any liability on Brunet or Motoreum is dependent on a finding that Motostalgia is liable to the Kosmatkas.

14

contemplate a sale at auction or otherwise arranged by Motostalgia. The March 3 and March 22 agreements diverge in the financial mechanics.

Neither party challenges the findings regarding the First Consignment Agreement. The trial court recited that the First Consignment Agreement "expressly provided that 'Motostalgia will guarantee the minimum net amount of $410,000 for the 5 vehicles' and 'that if the vehicles reach a total of above $451,000 all amount (sic) above that will be split 50% to the Kosmatka's (sic) and 50% to Motostalgia.'" The court had heard Sally Kosmatka's testimony that she believed the guarantee meant that Motostalgia would pay them $410,000 regardless of the sales prices. The court also had heard Brunet's interpretation that the Kosmatkas were guaranteed $410,000 only if the sales prices were high enough to leave that amount after Motostalgia was paid a 10% commission; Brunet indicated that the threshold would be reached at $451,000, after which the proceeds would be split evenly. We note that the First Consignment Agreement does not mention a commission. The trial court's finding sides with the plain language of the First Consignment Agreement as a pure guarantee of a minimum payment of $410,000 to the Kosmatkas.

By contrast, the Second Consignment Agreements do not guarantee a minimum payment to the Kosmatkas or a split of higher profits but do set a commission.[4] In a handwritten explanation in the blank for "Agreed Selling Commission," they each state that there is a 10% commission fee with "90% towards assembling and fixing cars to running and saleable

---

[4] Though Sally Kosmatka testified that she did not remember signing the Second Consignment Agreements and asserted that the Kosmatkas' signatures on them were copied from other documents, Brunet and Hedlund testified that the Kosmatkas signed them. The record contains legally and factually sufficient evidence that the Kosmatkas agreed to and signed the Second Consignment Agreements.

condition."[5] Brunet testified that this meant "the proceeds to fix the cars would come out of their 90 percent." The preprinted forms state, "SELLER agrees that any amounts owing to the auction company may be deducted from the proceeds due the seller." The terms of the later agreements are also inconsistent with the original agreement in that the original does not allocate the burden of paying for repairs to the cars or auction-house fees, and the later agreements do not guarantee any minimum payment to the Kosmatkas. Sally Kosmatka's testimony that she did not remember signing the Second Consignment Agreements is disputed by testimony from Brunet and Hedlund that she signed them.

There were plainly conflicts between the terms of the first and second consignment agreements and in the testimony about them. The Kosmatkas had the burden to prove their breach-of-contract claim, but the record supplies sufficient evidence to support the trial court's findings so that the trial court's resolution of the conflicts in evidence and its findings and conclusions are not against the great weight and preponderance of the evidence and are not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Dow*, 46 S.W.3d at 241-42; *Ellis*, 971 S.W.2d at 407. The evidence is legally and factually sufficient to support the trial court's finding and conclusion that the Second Consignment Agreements novated the First Consignment Agreement. *See CTTI*, 164 S.W.3d at 681. We overrule the Kosmatkas' argument that the trial court erred by concluding that the First Consignment Agreement did not remain a valid, binding, and enforceable contract between the Kosmatkas and Motostalgia (or any of the appellees) after the execution of the Second Consignment Agreements.

---

[5] There are some minor variations in the handwritten text. One agreement says "10% commission" without the word "fee," while another says instead "90% for assembling and repairing car."

16

**The record supports the conclusion that the Financial Agreement is not a valid contract.**

The Kosmatkas contend that the trial court erred by concluding that the Financial Agreement did not bind Motostalgia to pay them $225,750. The court found that the Financial Agreement contained no performance obligation owed by the Kosmatkas and no benefit to be conferred on Motostalgia. The court concluded that the Financial Agreement lacked consideration and is therefore not enforceable. The court further concluded that any purported debt owed under that agreement was not enforceable due to the novation of the First Consignment Agreement by the Second Consignment Agreements. The Kosmatkas challenge these findings and conclusions and contend that the Financial Agreement was the final agreement between the parties and novated all earlier agreements.

The existence of a written contract presumes consideration for its execution; therefore, a party alleging lack of consideration bears the burden to rebut the presumption. *Plains Builders, Inc. v. Steel Source, Inc.*, 408 S.W.3d 596, 602-03 (Tex. App.—Amarillo 2013, no pet.); *Doncaster v. Hernaiz*, 161 S.W.3d 594, 603 (Tex. App.—San Antonio 2005, no pet.); Tex. R. Civ. P. 94. Thus, appellees had the burden to prove the lack of consideration, and the Kosmatkas must on appeal show that no evidence supports the judgment (*Exxon*, 348 S.W.3d at 215 (legal insufficiency)) or that the evidence as a whole is so weak as to make the finding clearly wrong and manifestly unjust (*Thrash*, 605 S.W.3d at 230 (factual insufficiency).

The Financial Agreement recites that it is "regarding the sale of antique and classic cars . . . by John and/or Sally Kosmatka to Motostalgia" and that

> It is agreed that Motostalgia will make a cash payment of $6,500.00 a month during the first week of every month to John and/or Sally Kosmatka. These payments by Motostalgia to John and/or Sally Kosmatka will continue until the

17

sum of $225,750.00, currently owed by Motostalgia to John and/or Sally Kosmatka, has been paid off.

There are also provisions for late payments, redirection of payments if the Kosmatkas die, and additional payments by Motostalgia "when other funds become available." Though the Financial Agreement states that it concerns the sale of vehicles to Motostalgia, there is no provision in the Financial Agreement for the Kosmatkas to provide vehicles to Motostalgia. Further, that statement is inconsistent with the consignment agreements and all other evidence in the record that the Kosmatkas sold their vehicles listed in the consignment agreements *through* Motostalgia to *other buyers*.[6] The agreement purports to confirm a preexisting obligation from the previous transactions but mischaracterizes the previous transactions. More critically, a promise to fulfill a pre-existing obligation cannot serve as new consideration. *Walden v. Affiliated Computer Servs., Inc.*, 97 S.W.3d 303, 319 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

The Kosmatkas contend that their forbearance from immediately collecting on the outstanding debt arising from their performance and Motostalgia's partial performance of the obligations under the consignment agreements was consideration that conferred a benefit on Motostalgia of being allowed to pay over time. But the forbearance existed only if the debt was collectible when the Financial Agreement was reached, and Motostalgia's debt existed in the amount provided only if the $410,000 guarantee was valid and binding as a minimum owed to the

---

[6] There was testimony that Brunet found the five cars when purchasing a different item from the Kosmatkas; that sale/purchase was not part of the consignment agreements. The only evidence is that the Kosmatkas provided the five cars listed in the consignment agreements to Motostalgia to sell to *others* through auctions or private sales. There is no evidence that the Kosmatkas sold those five cars to *Motostalgia* who then kept or resold them. Rather, the bills of purchase and invoices on Motostalgia forms for the five cars list John Kosmatka as the seller to buyers who are not Motostalgia or any of the appellees.

Kosmatkas and if the sales were completed. But the only evidence is that the fourth and fifth cars had not been sold when the Financial Agreement was signed.

In addition to concluding that there was no consideration for the Financial Agreement, the trial court also concluded that the Financial Agreement did not describe a valid and enforceable debt: "Any purported debt owed by Motostalgia under the Final Financial Agreement was invalid and not enforceable due to the novation of the March 3, 2015 Consignment Agreement by the March 22, 2015 Consignment Agreements." Legally and factually sufficient evidence support that conclusion. The sum of $225,750 recited as owed in the January 2018 Financial Agreement was calculated based on the premise that Motostalgia had an existing obligation to pay the Kosmatkas $410,000. The Kosmatkas' belief that they were entitled to $410,000 persisted into late 2019 when Sally Kosmatka wrote Brunet, "Since March 2015, you have paid $295,250 out of the $410,000 owed, which leaves a balance of $114,750." But the $410,000 amount was set in the First Consignment Agreement, which the trial court found (and we have affirmed) was novated. Further, Brunet testified that the $410,000 figure was payable contingent on actual sales proceeds reaching that amount—sales that were not completed until *after* the Financial Agreement was signed—and was set as the threshold due before the 50/50 split of sales proceeds exceeding $451,000 ($410,000 for sales due to the Kosmatkas plus $41,000 in commissions for Motostalgia). When he "acknowledged" a debt in January 2018 based on the $410,000 "guarantee," two cars remained unsold, so the $410,000 figure could theoretically have become the baseline amount owed. But in his 2019 response to Sally Kosmatka's email, Brunet presented calculations based on amounts generated by the actual sales completed in 2018 after the Financial Agreement was signed. Brunet stated that the car sales prices totaled $367,200, offset in part by $17,700 in shipping the cars to and from auctions and $18,600 in storage fees—

19

deductions that did not include the costs of repair and advertising. The calculation of a "remaining amount" of $35,650 after deduction of the shipping and storage costs did not account for a 10% commission on the $367,200 in sales—a commission of $36,720 that the trial court found exceeded the "remaining amount" by $1,070. Brunet testified that he retained that commission when the Kosmatkas did not accept that amount as settlement of their claim for the full $410,000.

As we have determined that factually and legally sufficient evidence supports the trial court's finding and conclusion that the First Consignment Agreement was novated by the Second Consignment Agreements, the evidence supports the trial court's conclusion that there was no valid and binding agreement guaranteeing a minimum $410,000 payment from Motostalgia to the Kosmatkas—an essential underpinning of the calculations in the Financial Agreement. Accordingly, the Kosmatkas' implicit "performance obligation" of agreeing to accept monthly payments and foregoing immediate collection on the "full amount" of $410,000 was no consideration because the sales underlying Motostalgia's obligation to pay them were not complete and Motostalgia did not owe them $410,000 when the Financial Agreement was signed. Thus, although the Financial Agreement postdates the Second Consignment Agreement, the record contains legally and factually sufficient evidence to support the trial court's finding and conclusion that the Financial Agreement is not supported by consideration and is not valid and binding. The record does not support the Kosmatkas' contention that the Financial Agreement is a valid contract that novated or "trumped" the Second Consignment Agreements. We resolve the Kosmatkas' appellate issues in favor of the judgment.

20

**CONCLUSION**

Concluding that the Kosmatkas have not presented any issue requiring reversal, we affirm the trial court's judgment.

_____
Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Triana and Theofanis

Affirmed

Filed:   July 25, 2024